UNITED WATER WORKS COMPANY LIMITED, et al., Appellants, *v.* THE OMAHA WATER COMPANY et al., Respondents.

1. CORPORATIONS — REORGANIZATION AGREEMENT — CONSTRUCTION AS TO POWER OF BONDHOLDERS' COMMITTEE. A plan for the reorganization of a corporation, prepared and tendered by a voluntary committee to bondholders, who accept it and deposit their bonds thereunder, should be strictly construed as against the committee and in favor of the *cestuis que trust*.

2. EXTENT OF AUTHORITY OF COMMITTEE — FAILURE TO DISSENT. Where a reorganization agreement provides that a detailed plan of reorganization shall be submitted to the bondholders prior to the conveyance of any purchased property to a new company and that it shall be binding upon them unless a majority in interest shall within thirty days file a written dissent, the committee has no power to incorporate into it anything more than details for carrying out the general provisions of the original agreement, and the failure of the majority to dissent binds them in respect to such details only.

3. DEPARTURE FROM REORGANIZATION AGREEMENT. A bondholders' committee, which is authorized by a reorganization agreement to procure the foreclosure of the mortgage securing the bonds, to purchase the property and convey it to a new company, in which event the committee, after the payment of the expenses of foreclosure and all its own expenses, is to

6

allot to the holders of certificates, representing the bondholders' interest, their·proportionate interest in the new company, has no power, after the purchase of the property under such circumstances as to cut off all other interests in it except that of the certificate holders, to incorporate into its detailed plan of reorganization a provision allotting to preferred shareholders of the old company a large part of the common stock of the new company at ten cents on the dollar; and the failure of a majority in interest of the certificate holders to file a written dissent to the plan does not make it binding upon them, since it is a departure from, and not a mere detail of, the plan contemplated by the original agreement.

4. ASSUMPTION OF POWER BY COMMITTEE.  A provision in such detailed plan which authorizes the committee to control all of the stock of the new company until two issues of preferred stock shall have paid five per cent dividends for five consecutive years, at a rate of compensation for the committee to be fixed by themselves, or, in the event of question, by two persons to be selected by them, is unauthorized and beyond the power of the committee, where there is no such provision in the original agreement and no intimation that the bondholders' property was to be controlled for an indefinite period.

*United Water Works Co.* v. *Omaha Water Co.*, 29 App. Div. 630, reversed.

(Argued May 21, 1900; decided October 2, 1900.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered June 15, 1898, affirming a judgment in favor of defendants entered upon a dismissal of the complaint by the court on trial at Special Term.

This action was brought to obtain a judgment declaring null and void a certain conveyance, transfer and assignment made by the Farmers' Loan and Trust Company to the Omaha Water Company, of the property, assets and franchises of the American Water Works Company, purchased by said trust company under foreclosure proceedings, and certain deeds of trust executed by the said Omaha Water Company to the Guaranty Trust Company of New York and to the Farmers' Loan and Trust Company to secure the payment of certain bonds of said Omaha Water Company, ordering the same to be discharged of record and directing the said trust companies and Omaha Water Company to execute and deliver such deeds, conveyances and releases as might be necessary; declar-

ing void all bonds and shares issued by said Omaha Water Company and directing that they be surrendered to the court or to a receiver or trust company appointed to receive them, and enjoining said company, its officers and agents, from executing or transferring any of its bonds or shares or in any way carrying into effect a certain proposed plan of reorganization of the American Water Works Company. ·

The facts, as far as material, are stated in the opinion.

*George H. Yeaman* for appellants. The scheme of reserving to the committee, as a voting trust, the perpetual control of the new company, to which has been conveyed " the absolute property " of the old bondholders, a property held " in trust " by the defendant, the Farmers' Loan and Trust Company, is fraudulent and against public policy. (*Starbuck* v. *M. T. Co.*, 60 Conn. 576; *Vanderbilt* v. *Bennett*, 6 Penn. Co. Ct. Rep. 193; *Mason* v. *P. M. Co.*, 133 U. S. 50; *Pondir* v. *N. Y., L. E. & W. R. R. Co.*, 72 Hun, 384; *Merrill* v. *F. L. & T. Co.*, 24 Hun, 297; *Hollister* v. *Stewart*, 111 N. Y. 644; *Vatable* v. *N. Y., L. E. & W. R. R. Co.*, 9 Abb. [N. C.] 271; *F. L. & T. Co.* v. *N. Y. & N. Ry. Co.*, 150 N. Y. 410; *H. Nat. Bank* v. *Y. B. Co.*, 74 Fed. Rep. 112; *C. of G. Ry. Co.* v. *Paul*, 93 Fed. Rep. 878.)

*David McClure* and *Howard Mansfield* for respondents. Upon the established facts the plaintiffs had not sufficient standing in equity to maintain this action. (*N. Y. S. & T. Co.* v. *Lipman*, 157 N. Y. 551; *Amherst College* v. *Ritch*, 151 N. Y. 288.) The action was bound to fail, because the reorganization which it assailed was already an accomplished fact. (*White* v. *Wood*, 129 N. Y. 535; 149 N. Y. 659.) The detailed plan of reorganization was not in any respect illegal. (*Cowell.* v. *Springs Co.*, 100 U. S. 55; *Christian Union* v. *Yount*, 101 U. S. 352; *Vanderpoel* v. *Gorman*, 140 N. Y. 563; *Lancaster* v. *A. I. Co.*, 140 N. Y. 576; *Watts* v. *Gantt*, 42 Neb. 869; *Carlow* v. *Aultman*, 28 Neb. 672; *M. L. V. Co.* v. *Bushnell*, 11 Neb. 192; *M., etc.,*

*R. R. Co.* v. *Don,* 19 Fed. Rep. 388 ; *M. & O. R. Co.* v. *Nicholas,* 12 South. Rep. 723 ; *Erwin* v. *P. & R. R. R. Co.,* 7 R. & C. L. J. 87.)

Parker, Ch. J.  The plaintiffs own a few of the bonds, of which three million six hundred thousand dollars worth were issued secured by a mortgage of four millions given to the Farmers' Loan and Trust Company, as trustee, upon certain water works and plant at Omaha, Nebraska, which were at the time owned by an Illinois corporation known as the American Water Works Company.  There was an underlying mortgage of $400,000, which represents the difference between the actual issue of bonds under the second mortgage and the amount authorized to be issued, but as they could be issued only for the purpose of taking up the first mortgage bonds, there was never any opportunity for their issue.  Whatever may have been the earning capacity of the Omaha water works, it seems not to have been profitable to the stockholders of the corporation having the title to it, and for a short period of time prior to the 16th of August, 1893, the owners of the bonds failed to receive the interest due to them, and, as the property had passed into the possession of a receiver appointed by the court, it was not unnatural that the bondholders began to manifest some interest about the future of the property.  While the matters were in that general situation some gentlemen of prominence in finance volunteered to serve as a committee for the bondholders (not entirely from philanthropic motives, as a later estimate of $360,000 for counsel fees and the expenses of reorganization and compensation of the committee indicates). The committee, who styled themselves the "Bondholders' Committee," addressed a communication to each of the several bondholders urging them to deposit their bonds without delay with the Farmers' Loan and Trust Company and inclosed the plan of the committee for their guidance in determining whether to accept the committee to represent them.  This plan was dated August 16th, 1893; was addressed to "Holders of Bonds of The American Water Works Company of

Illinois, secured by mortgage upon the Omaha Water Works;" and the opening recital was: "For the purpose of protecting their respective interests, the owners and representatives of a large amount of the outstanding bonds of The American Water Works Company * * * have agreed to the following plan, and have irrevocably appointed the undersigned and their successors a committee for carrying out such plan, which the undersigned have undertaken to do."

The first subdivision of the plan named the committee and provided, among other things, that, in the event of any vacancy in the committee by death or accepted resignation of a member, it should be filled by a majority of the remaining members.

The second provided that the bonds and coupons should be transferred to the committee in trust for the purpose of carrying out the plan and should be deposited with the Farmers' Loan and Trust Company, which should issue, "subject to the terms and conditions hereof, its negotiable certificates;" and that "such bonds and coupons shall thereafter be held by the trust company in trust for the committee for the purposes of the plan."

The third provided that the committee should take action to cause the mortgage to be foreclosed as soon as possible.

The fourth authorized the committee, in its discretion, to purchase the property at the foreclosure sale for any price not exceeding the principal and interest then accrued and unpaid on all the bonds, and to apply towards the payment of the property the bonds and coupons deposited.

The fifth related to the first mortgage of $400,000, and the action that should be taken by the committee in the event of the foreclosure of that mortgage, but, as that did not take place, that subdivision has no bearing on the present discussion.

The sixth subdivision, so far as important, provided that in case the committee should purchase the mortgaged property it might convey the same to the new company incorporated under the laws of such state as the committee might determine.

The seventh empowered the committee to sell all the bonds and coupons for not less than the principal and interest plus the expenses and charges of the trustee and of the committee.

The eighth, among other things, conferred upon the committee the power to borrow money for the purpose of carrying out the plan and authorized it to pledge, for the repayment of any such moneys, any of the bonds and coupons, or any other assets in the hands of the committee.

The ninth assured the committee of a reasonable compensation for its services, as it provided that in case of question the amount should be determined by the presidents of two New York trust companies, both of whom should be selected by the committee.

The tenth provided for an initiatory assessment of $10 per bond of $1,000 each, to be paid by the holder upon the deposit of the bonds, toward paying the legal and other expenses of carrying out the plan, to meet which expenses it was provided that the committee might make further assessments. Fourteen days later, however, the committee addressed a further letter to the bondholders, which was apparently intended to assure the bondholders that the assessment for legal and other expenses would not be exorbitant, for it provided: "Any assessment that the committee may make for legal and other expenses on holders of certificates issued for deposited bonds, in addition to the payment at the time of deposit, will not exceed ten dollars per bond;" thus, apparently, providing that both assessments on the bondholders for legal and other expenses should not produce to exceed $72,000.

Having provided by the seventh subdivision, as we have already observed, that the committee might sell the bonds for not less than the principal and interest, plus the expenses of the trustee and of the committee, the eleventh subdivision assured the bondholders that if a new company should be created the committee would allot to the bondholders, who were to be termed certificate holders after the deposit of their bonds with the trust company, their proportionate interest in the new company.

The twelfth subdivision, which is one of considerable importance on this review, read as follows: "The Committee shall, prior to the conveyance of any purchased property to the new company, submit to the certificate holders a detailed plan of reorganization, which shall be binding upon all said holders, unless the holders of a majority in interest of the outstanding certificates shall, within thirty days, file with the Trust Company their written dissent from said plan."

The thirteenth related to the manner in which a notice from the committee to the certificate holders might be given.

The fourteenth read as follows: "The Committee may supply any defects or omissions in this plan which it shall deem necessary to be supplied to enable the Committee to carry out the general purposes of the plan; and with the consent of the holders of a majority in interest of the outstanding certificates, may take any action other than is provided for in this plan which the Committee shall unanimously determine to be for the benefit ratably of all of the certificate holders."

The fifteenth and sixteenth authorized the committee to determine the time within which bonds and coupons might be deposited, and authorized their return by the committee in the event that a majority of the bonds had not been deposited by November 1st, 1893.

The holders of 3,569 of the 3,600 mortgage bonds issued under the second mortgage, including the holders of the bonds now belonging to this plaintiff, accepted the plan proposed to them by the committee and transferred their bonds to the bondholders' committee by depositing the same with the Farmers' Loan and Trust Company, in pursuance of the agreement of August 16th, 1893, and received therefor negotiable trust certificates, representing their various interests as such depositors. And the holders of certain unpaid coupons of such bonds, which matured prior to January 1st, 1894, made a similar deposit and received separate certificates, with special provisions for such coupons, for the purpose of preserving their status, which was that of a lien on the mortgaged prop-

erty prior to that of the bonds.   The title of the bonds being
thus vested in the committee, but in trust, nevertheless, for
the purpose stated in the agreement of August 16th, it took
the necessary steps to have the trust company foreclose the
mortgage given to secure such bonds — a mortgage that pro-
vided, among other things, that if the trust company bid in
under foreclosure it should hold the property in trust as the
absolute property of the bondholders.   By the terms of the
decree of foreclosure, thereafter granted, it was provided that
the trust company, designated in the mortgage as the trustee
for the bondholders, might bid in the property, and that, in
the event that it should do so, it should hold the property so
bid in and paid for, with the bonds, in trust as the absolute prop-
erty of such of the bondholders as should request such purchase,
and the bondholders should take and receive the certificates of
the clerk of the court, showing their interest in the property.
Prior to the sale of the property, pursuant to the decree, the
committee fixed upon the sum of four millions and a half as the
amount which the trust company could bid for the property
in behalf of the committee representing the bondholders,
which sum was understood to cover the principal and interest
due on the bonds, the costs of foreclosure and the expenses
and compensation of the committee.   But the trust company
bid in all of the property and the franchises for $4,009,500,
on the twentieth day of May, 1896.   Inasmuch as the com-
mittee had not been able to sell the bonds, but had found it
necessary to bid in the property under the plan which had
been proposed, it became the duty of the committee to organ-
ize a new company and the agreement of August 16th pro-
vided that, in such event, the committee should, after pay-
ment of the expenses of foreclosure and all expenses incurred
by the committee and its compensation, allot to the certificate
holders their proportionate interests in the new company.   A
few days later, on June 9th, the committee issued a circular
statement addressed to the remaining bondholders, now styled
certificate holders, which was called: "Detailed Plan of
Reorganization."   It will be remembered that it was provided

by subdivision twelve that a detailed plan of reorganization should be submitted prior to the conveyance of the property to a new company; and the most important of the questions presented on this review is whether the so-called "details of the plan of reorganization," issued June 9th, are in fact details of the original plan, or constitute, in some respects, an entirely different plan and, therefore, are not within the scope of the agreement of August 16th.

This court, in speaking of the so-called modification of a reorganization agreement, in *Cox* v. *Stokes* (156 N. Y. 491, 507), said: "The reorganization committee were, in a broad sense, trustees for the benefit of the bondholders and were bound to protect their interests in every reasonable way. Their powers were defined and limited by the reorganization agreement. While they had a wide discretion as to all matters not specifically provided for, as to those matters they were bound to compliance with the stipulations of the agreement, which they could neither set aside nor disregard. They had no power to change that agreement without the consent of the bondholders, whose representatives they were. They could not recast it nor surrender rights which it expressly secured to the bondholders. * * * They could not add to their authority by changing the agreement, which was the source and limit of their power, any more than one can add to his stature by taking thought." That which was submitted as a detailed plan of reorganization provided for a new company to be incorporated under the laws of the state of Maine; the committee to name and be eligible to membership in the first board of directors; the new company to be authorized to issue prior lien twenty-five-year five per cent gold bonds to the amount of one million and a half, to be secured by a mortgage on all the franchises and property of the company, a portion of such issue to be used to take up the bonds secured by the first mortgage of $400,000 which was not foreclosed. It was also authorized to issue consolidated mortgage fifty-year gold bonds to the amount of six millions, to be secured by a mortgage on all the franchises and property of the company, to rank after the prior

lien bonds; to issue first preferred five per cent non-cumulative stock to the amount of not more than $750,000; also second preferred stock to the amount of not more than $1,000,000, and common stock to the amount of not more than $2,500,000, making the total authorized issue of bonds and stock of all classes $11,750,000. It allotted to the old bondholders no part of the first issue of bonds, amounting to one million and a half, and only three million six hundred thousand of the consolidated six million issue. Bondholders were also to receive beneficial certificates pertaining to the first preferred stock — not the stock itself — amounting to $540,000, while the $210,000 remaining of that issue was to be retained for the payment of one-half year's interest on new consolidated mortgage bonds and for the general purposes of reorganization or for the use of the new company. Of the one million issue second preferred stock, the bondholders were to receive beneficial certificates pertaining thereto amounting to $600,000, while the remaining four hundred thousand was to be given as compensation to holders of depositors' six per cent bonds for reduction to five per cent and for general purposes of reorganization. Beneficial certificates pertaining to the common stock of two millions and a half were to be issued to holders of preferred stock of the American Water Works Company of New Jersey to at least the amount of their holding of the old preferred stock at the price of ten dollars per share. So that no part of this stock was to go to the bondholders, for whose benefit the property was purchased and held in trust, unless some part of the stock should not be disposed of under the plan of reorganization, in which case such residue was to be delivered ratably to the certificate holders. And further, the bonds and beneficial certificates allotted to the bondholders were only to be issued on their paying a cash assessment of fifteen per cent of par value of bonds aggregating $540,000. As has been observed, a present issue of stock, whether preferred or common, is not provided for, but beneficial certificates instead; and the reason for it is found in the sixth subdivision of the detailed

plan, which provides that " the stock of the new company of all classes, except such shares as may be disposed of to qualify directors, is to remain in the name of the committee or their nominees, of the same or a less number, and their successors, as joint owners, with unrestricted right to vote thereon, until the first preferred stock and the second preferred stock shall each have received an annual five per cent dividend for five consecutive years.   *   *   *   The expenses incurred in carrying out these provisions with regard to the control of the stock are to be borne by the new company."

Thus, we see, that instead of allotting to the certificate holders their proportionate interests in the new company, after payment of expenses of foreclosure and of expenses incurred by the committee, as was agreed in subdivision eleven of the agreement of August 16th, the committee provided in its so-called detailed plan for a sale of beneficial certificates of common stock for ten cents on the dollar to the preferred stockholders of the old company, who had no interest whatever in this property after its purchase for the benefit of the bondholders, thus depriving the bondholders of whatever of value there was in this stock above ten per cent of its face ; and further provided for an indefinite, and what might perhaps prove to be a perpetual, control of the property by permitting the committee to retain command over every share of stock, except such as may be necessary to qualify directors, with the right to compensate themselves for the expenses incurred out of the funds of the new company, which they are to control.   The new company is to bear these expenses of control because such control is to continue until the first and second preferred stock have each paid a dividend of five per cent for five consecutive years.   Whether the five consecutive years means concurrently or alternately the committee are to determine, for the detailed plan provides that the construction of the provisions of these plans by the committee shall be conclusive.   The construction might be adopted on which the company should pay a dividend on the first preferred stock for five years and on the second for four years, and then pass

the dividend on the second preferred stock and start over again on the view that the five years must be concurrent. These provisions have the earmarks, to say the least, of an intention to provide for substantially perpetual control on the part of the committee and their successors of property which the committee acquired in trust for the bondholders.

The question that we are to consider under this head is not whether the parties might have lawfully agreed that the committee should be constituted a voting trust for an indefinite period of time, but whether there was such an agreement entered into between the parties.

So also the question arising as to the legality of the proposed disposition of two millions and a half of the common stock to the holders of preferred stock of the American Water Works Company of New Jersey, depends upon the scope of the agreement. The agreement of August 16th did not contemplate the issue of any stock to the stockholders of the American Water Works Company, and the only attempt at justification of the action of the committee that I can find in the brief of the learned counsel for the respondent is stated in these words : " By placing a low price on the certificates, the committee could make some provision for the real owners of the equity of the property. Some such recognition of the stock interests, besides being almost universal in reorganizations, is in this state specifically provided for by statute." The parties to the agreement might have provided for a reorganization that would have considered the interests of the stockholders as well as those of the bondholders, but nothing of the kind was attempted. As we have already noted, the committee styled themselves, from the beginning, the bondholders' committee; its proposition was to utilize the property for the protection of the bondholders and for them alone; the mortgage provided that in the event of a purchase by the trustee it should be for the sole benefit of the bondholders; the decree of foreclosure was in line therewith; every step in the proceeding, from beginning to end, down to the so-called detailed statement of June 9th, proceeded on the theory that

the committee was acting for the bondholders alone and that the purchase of the property was in trust for them. The stockholders were not parties, nor were they consulted; their interests were not considered and no one suggested their protection. On the contrary, the committee agreed that if the new company should be formed, it would allot to the certificate holders their proportionate interests in the new company after payment of expenses of foreclosure and all expenses incurred by the committee. It was under that agreement, to which the bondholders became parties by the deposit of their bonds and the receipt of certificates therefor, that the committee acquired the right to act in the premises, and by it they were limited to a division and disposition of the securities of the new company either among, or for the benefit of, the bondholders. They acquired under it no right to make a present of any interest whatever in the new company to others than the holders of the bonds, and the attempt to do it, whatever the motive, was in violation of the trust voluntarily assumed.

To the contention generally made that the detailed plan of June 9th, 1896, embraced all matters complained of and that a majority of the bondholders not having dissented within thirty days, it became a part of the agreement, we answer that, in so far as the circular letter of June 9th was a detail of the plan, the contention is well founded, but in so far as it is directly hostile to the agreement, it is not so. The word "detail," as used in this agreement, means minor particulars necessary to complete a reorganization, but consistent with the original plan, and lawful and honest. In matters of substance nothing may be done under the detailed plan that could not have been done under the original agreement. That was the idea conveyed by the use of the word "detail" in the connection in which it appears, and, in view of the fact that the members of the committee were soliciting the trust and confidence of the bondholders when they invited them to become parties to an agreement which they had prepared and tendered, it should be strictly construed as

against the committee and in favor of the *cestuis que trust*. Such a construction necessarily denies to the committee the power, under guise of a detail of the original agreement, to incorporate into it a provision authorizing the committee to permit other parties than the holders of bonds to share in the property which had been bought in for the benefit of the bondholders alone. If this were not so then the committee might have gone further than to dispose of the absolute control of the bondholders' property (in the event that the committee should conclude to part with the control themselves) for a merely nominal sum, as they seek to do by disposition of two million and a half of common stock, and have provided for a disposition of preferred stock, or even of bonds, to persons who they might be persuaded have some equity in the old company that ought to be recognized and compensated. But in the one case, as in the other, the attempt to give away interests in the new company would be in violation of the agreement that after the payment of costs of foreclosure and the costs, expenses and compensation of the committee, the committee should allot to the certificate holders their proportionate interests in the new company, for theirs was the entire interest. The provision that the detailed plan should be binding upon all certificate holders, unless the holders of a majority in interest should within thirty days file their dissent from the plan, does not embrace anything except details of the plan included in the original agreement — does not include matters in contravention of the original plan and hostile to it, by which the rights and interests of the bondholders are sought to be taken away and given to others. The failure of the majority to dissent within thirty days, therefore, confirmed so much of the circular letter of June 9th as was in reality a detail of the plan of August 16th, but in so far as it contained provisions in direct conflict with such plan, it had no effect whatever, as it was not a part of the original agreement, under which the bonds were filed, that its material provisions or any of them could be stricken out and others widely different in effect sub-

stituted by the committee, unless a majority should dissent within thirty days. It follows, if the views so far expressed be sound, that the committee is without authority to dispose of beneficial certificates pertaining to the common stock, for a nominal sum, to the holders of the preferred stock in the old company. Whether the two millions and a half of stock has been issued we are not advised by this record ; for while the plaintiff attempted to show, by a member of the committee, the situation in that respect, the evidence was objected to and excluded and plaintiff excepted.

The reasons assigned for holding that the provisions in the so-called detailed plan, providing for the issue of common stock, are not within the agreement of the parties, and, therefore, the committee is without authority to carry it out, are applicable also to that portion of it which authorizes the committee to control all of the stock until the two issues of preferred stock shall have paid five per cent dividends for five consecutive years at a rate of compensation for the committee to be fixed by themselves, or in the event of question by two persons to be selected by them. There was no such provision in the original agreement, no intimation that the bondholders' property was to be controlled for an indefinite period of time, if not perpetually, by men having no other interest in the company than the compensation to be received for such control. It is a matter of every day occurrence, of course, that men having no financial interest in great properties, other than the compensation to be received for their services, are vested with extensive powers of management and control temporarily, but the power is always reserved in those who own the property to cut down the power of such managers, or to make a change in management ; in this case, however, the committee has planned to have the management for an indefinite period of time at a rate of compensation to be substantially fixed by themselves, thus seeking to fasten themselves upon the property in such a way that the real owners of it cannot loosen their hold if they should attempt it ; so, if it be suggested that improvements are necessary in order to increase

the earning capacity of the property, the real owners of it are to be deprived of the power to determine whether they shall be made or not. If a hint at any such scheme on the part of the committee had been contained in the original agreement, it may well be doubted whether any of the bond-holders would have deposited their bonds under it; for the persons are, I take it, comparatively few who will voluntarily turn over their property to the control of others under such circumstances as will prevent them from retaking control in the event of their becoming dissatisfied with the management of the property. When, for the first time, these important provisions found their way into the circular letter of June 9th, 1896, they appeared there not as a detail of the plan contained in the agreement of August 16th, 1893, and, therefore, for the reasons given in considering whether the issue of common stock was authorized by the agreement, the committee did not, by its assertion, acquire the authority to retain the control of both the preferred and common stock for any period of time whatever.

It is urged by the learned counsel for the appellant that the new company was over-capitalized, and that this court should consider whether the details of the plan are not, therefore, in contravention of a sound public policy; but we have not considered the question for the reason that the record does not show with any degree of certainty what may be the fact in that regard. The plaintiff attempted to prove the value of the property, but the court refused to permit him to do so, and counsel excepted. We think in view of the nature of the action that the evidence should have been received to the end that it might have been determined whether the question that the plaintiff seeks to raise is fairly presented.

The judgment should be reversed and a new trial granted, with costs to abide the event.

O'BRIEN, HAIGHT, MARTIN, LANDON and WERNER, JJ., concur; GRAY, J., dissents.

Judgment reversed, etc.