THE INDUSTRIAL AND GENERAL TRUST, LIMITED, Respondent, v. J. KENNEDY TOD et al., Appellants, Impleaded with Another.

RAILROADS — WHEN ACTS OF REORGANIZATION COMMITTEE DO NOT CONSTITUTE CONVERSION, BUT A BREACH OF CONTRACT. Under a reorganization agreement made by the bondholders of an insolvent railway company during the pendency of an action to foreclose the mortgage given to secure the bonds, which agreement conferred upon a reorganization committee, therein named, the legal and equitable title of the bonds for the purpose of reorganizing the affairs of the railway company, together with all the power and authority necessary for that purpose, and required the committee to make and adopt a plan of reorganization and give notice thereof to the bondholders so that any of them might withdraw from the agreement if the plan should not be satisfactory and recover back the bonds deposited thereunder, and authorized the committee to form a new corporation and use such bonds for the purpose of purchasing any of the assets and franchises of the old company for a new corporation, and further provided that the committee might construe its provisions, and their construction should be final, and that no member of the committee should be liable for "anything but his own willful misconduct," an action of conversion will not lie against the members of the committee for using the bonds to pay the purchase price of the railway property bid in by the committee at the sale in the foreclosure action without first making a plan of reorganization and giving notice thereof as required by the reorganization agreement; since the failure of the committee to make such plan of reorganization and give notice thereof before making such use of the bonds must be regarded as a breach of contract and not a conversion of the bonds.

*Industrial & General Trust* v. *Tod*, 52 App. Div. 195, reversed.

(Argued December 31, 1901; decided March 25, 1902.)

APPEAL from a judgment, entered June 12, 1900, upon an order of the Appellate Division of the Supreme Court in the second judicial department, overruling defendant's exceptions, ordered to be heard in the first instance by the Appellate Division, and directing judgment for plaintiff upon a verdict and affirming an order denying a motion to set aside such verdict and for a new trial.

The plaintiff instituted this action to recover damages of the defendants for the alleged conversion by them of 570 bonds of the Birmingham, Sheffield and Tennessee River Railway Company, a corporation of the state of Alabama. The plaintiff, an English corporation, had become the owner of the bonds and, after that the trustee in the mortgage of the railway company securing the bonds, upon the company's default, in 1893, had commenced an action for its foreclosure and a reorganization agreement between bondholders had been prepared, in 1895, its bonds were deposited with the Manhattan Trust Company, the depositary provided for in the agreement, by its agent in this country. He received, upon that deposit, a certificate, negotiable in form, which stated that the bonds were held by the trust company according to the terms of the reorganization agreement. This reorganization agreement recited the insolvency of the railway company, the pendency of the foreclosure proceedings, the appointment of a receiver and the necessity for the bondholders to reorganize for the protection of their mutual interests. It provided, in its first article, that the bonds should be deposited with the Manhattan Trust Company, " subject to the order and full control of the committee, to be used for any purposes under this agreement. The deposit of such bonds shall transfer to the committee the full legal and equitable title thereto for all the purposes of this agreement." The second article constituted the defendants a reorganization committee and in succeeding articles were set forth the powers of the committee. The fourth article provided, so far as material, that " the committee is hereby expressly authorized and empowered, and it shall be its special duty, to prepare and adopt a plan

for the reorganization of the affairs of the railway company, with or without foreclosure.   When the committee shall have adopted such plan, a copy thereof shall be lodged with the Manhattan Trust Company. Notice shall thereupon be given to the holders of the trust certificates issued hereunder, and such plan shall become binding upon all of the said holders who do not withdraw herefrom, (in the manner hereinafter provided), unless the holders of a majority in interest of the said certificates shall, within twenty days after such notice, file with the Manhattan Trust Company their written dissent from the plan." The fifth article provided, so far as material, that "any holder of a trust certificate issued hereunder may, at any time within thirty days after the mailing to him of notice of the filing of a plan of reorganization, as hereinbefore provided, withdraw from this agreement and recover back the bond or bonds deposited by him, upon payment of his *pro rata* share of the expenses theretofore incurred by the committee," etc. The sixth article provided that the committee, for the purpose of effecting a reorganization of the affairs of the railroad company, was authorized to take such steps as it might deem advisable for the formation of a new corporation and for transferring to the new corporation all the assets of the railway company, and it was authorized to use the deposited bonds for the purpose of paying for any assets or franchises purchased." The eleventh article provided, so far as material, that "the committee may supply any defects or omissions which it may deem necessary to be supplied to enable it to carry out the general purpose of this agreement. The committee is authorized to construe this agreement, and its construction shall be final." The twelfth article provided that no member of the committee shall be liable for "anything but his own willful misconduct."

In July, 1895, following the execution by the bondholders of the reorganization agreement, a decree of sale was entered in the pending foreclosure suit and on September 16th, 1895, a sale of the railroad franchises and properties was had, at which they were bid in by the committee at the price of

$500,000; which sum the decree had fixed as the lowest bid to be received. In October, a decree of confirmation of the sale was made. In November, the Northern Alabama Railroad Company was incorporated, to operate upon the same lines as the former company, and a deed was made by the commissioner of sale to the new railway company of all the property and franchises of the former Birmingham, Sheffield and Tennessee River Railway Company. Thereafter, the bonds deposited under the reorganization agreement were produced before the commissioner of sale, who stamped upon each bond, as follows: "New York, 29th November, 1895. $139.76 paid on this bond as part of the proceeds of the sale under foreclosure. J. Fred. Johnson, Commissioner."

The Northern Alabama Railway Company issued certain mortgage bonds, which, with its capital stock, were held by, or for, the reorganization committee. It, further, appeared in evidence that in July, 1895, before the foreclosure sale, the plaintiff's agent was advised, in a letter from the chairman of the committee, that the mortgaged property was advertised for sale on September 16th, following; that no plan of reorganization had yet been adopted and that no date could be given, upon which a plan would be issued. Subsequent to the sale, there was some correspondence between the plaintiff's agent and the reorganization committee upon the subject of the formulation of a plan of reorganization. The committee continued to hold, or to control, all of the bonds and stock of the new railway company, until the reorganization was completed in July, 1898; at which time a plan of reorganization was filed and notice thereof was given to all the holders of certificates under the reorganization agreement. In October, 1898, as the result of certain negotiations and of an agreement of the Southern Railway Company, that company offered to purchase all the bonds and stock of the new railway company at a price of 80 for the bonds; which represented much more than twice the sum payable upon the bonds at the price paid for the railroad property upon the judicial sale in foreclosure. The plaintiff's bonds remained

with the Manhattan Trust Company and the plaintiff, or its agent, holds the certificates representing them. The defend-- ant; hold the new properties subject to the certificates of deposit.

The trial judge, in submitting the case to the jury, held in his charge, as matter of law, that the acts of the defendants amounted to a conversion of the plaintiff's bonds and he charged, at the express request of the plaintiff, to the effect that the failure of the defendants to prepare a plan of reor- ganization, prior to the sale in foreclosure, and their use of the plaintiff's bonds in furtherance of the sale, without the plaintiff's consent, were wrongful acts, subjecting them to a liability to the plaintiff for the value of its bonds. At the plaintiff's request he, also, charged that, if the defendants dealt with the bonds in a manner not authorized by the plain- tiff, or by the terms of the reorganization agreement, they were liable as for a conversion; although there was no wrong- ful intent on their part. To the denial of a motion to dismiss the complaint, on the ground that there was no conversion, and to the instructions to the jury, the defendants duly excepted. The jury returned a verdict for the plaintiff, in an amount greatly in excess of the amount to which the bonds would be entitled upon the basis of the sum bid for the rail- road property at the foreclosure sale, upon evidence showing the present value of the railway properties. The defendants' exceptions were ordered to be heard, in the first instance, at the Appellate Division; where the exceptions were overruled, the motion for a new trial was denied and a judgment was directed in favor of the plaintiff upon the verdict. The defendants then appealed to this court.

*Stephen H. Olin* and *Austen G. Fox* for appellants. The reorganization agreement, dated April 9, 1895, did not require the committee to prepare a plan of reorganization before the sale of the mortgaged property, and the omission of the com- mittee to prepare such a plan before the sale was not a breach of the contract. (*Miller* v. *Dodge*, 28 Misc. Rep. 640.) It

was error in the trial court to refuse to regard the clause in the agreement which provides "the committee is authorized to construe this agreement and its construction of the same shall be final," and it was also error to refuse to submit to the jury the question of the defendant's good faith in construing the agreement. (*White* v. *Wood*, 129 N. Y. 527; 140 N. Y. 656; *Drake* v. *N. Y. S. W. Co.*, 36 App. Div. 275; *D. & H. C. Co.* v. *P. C. Co.*, 50 N. Y. 250, 258; *Sweet* v. *Morrison*, 116 N. Y. 19, 32; *Whiteman* v. *New York*, 21 Hun, 117; *Perry* v. *Cobb*, 88 Me. 435; *Van Siclen* v. *Bartol*, 95 Fed. Rep. 793; *Wells* v. *S. N. Co.*, 2 N. Y. 204; *Nichols* v. *N. Y. C., etc., R. Co.*, 89 N. Y. 372; *Drake* v. *Shorter*, 4 Esp. 165.) Assuming that the sale without filing a plan was contrary to the defendants' obligations, still, after the notification of July 16, 1895, the plaintiff acquiesced in the sale unless it protested against it within a reasonable time. (*Gage* v. *Sherman*, 2 N. Y. 417; *Hope* v. *Lawrence*, 50 Barb. 258.) The plaintiff having, with full knowledge of the actual sale, required the defendants to perform the very act now held to be a conversion, ratified the act as matter of law and was estopped from repudiating it. (*Masson* v. *Bovet*, 1 Den. 69; *Grace* v. *Clark*, 5 Den. 503; *Harrad* v. *McDaniels*, 126 Mass. 415.) The act held to be conversion, namely, using plaintiff's bonds as part payment of the purchase money for the railway, was not a conversion which will sustain an action in trover. (2 Jaggard on Torts, 718, 720, 722; *Brintnall* v. *Smith*, 166 Mass. 253; *Fouldes* v. *Willoughby*, 8 M. & W. 540; Addison on Torts [7th ed.], 498, 501; *Head* v. *Carsey*, 11 C. B. 977; *Chase* v. *Blaisdell*, 4 Minn. 90; *Spooner* v. *Manchester*, 133 Mass. 27; *Frome* v. *Dennis*, 45 N. J. L. 516; *Simmons* v. *Lillystone*, 8 Exch. 431; *Donald* v. *Suckling*, L. R. [1 Q. B.] 585; *Halliday* v. *Holgate*, L. R. [3 Exch.] 299; Pollock on Torts [6th ed.], 348, 349; Cooley on Torts [2d ed.], 521, 527, 530; *Fennings* v. *Lord Granville*, 1 Taunt. 241.) If we assume that the act complained of was a conversion, nevertheless the plaintiff cannot maintain trover, because at

the time of the conversion the plaintiff had neither possession of the bonds nor the right to their possession, nor any title to them, legal or equitable. (*Hull* v. *Carnley*, 11 N. Y. 501; *Clements* v. *Yturria*, 81 N. Y. 285; *Petrie* v. *Stark*, 79 Hun, 550; *Kreider* v. *Fanning*, 74 Ill. App. 230; *Halliday* v. *Holgate*, L. R. [3 Exch.] 299; *Schryer* v. *Fenton*, 15 App. Div. 158; *Byam* v. *Hampton*, 57 Hun, 585; *Field* v. *Early*, 167 Mass. 449; *Cox* v. *Stokes*, 156 N. Y. 491; *Martin-Baine Co.* v. *Jackson*, 24 App. Div. 354.) The defendants, having come lawfully into possession of the bonds, were not liable for the conversion of them in the absence of demand and refusal. (*Williamson* v. *Seely*, 22 App. Div. 389; *Castle* v. *C. E. Bank*, 75 Hun, 89; *Delahunty* v. *Hull*, 10 App. Div. 230; 20 App. Div. 430.) At the time of the alleged conversion all the franchises and property of the Birmingham, Sheffield and Tennessee River Railroad Company, upon which the bonds had formerly been secured by mortgage, had been sold under foreclosure of the mortgage and could never in any way be subjected to the payment of any part of the bonds. Hence the value of the bonds at the time of the alleged conversion was not affected by the value of the railway property, and it was error to admit evidence of the value of the railway property as evidence of the value of the bonds. (*Totherson* v. *Chapin*, 20 J. & S. 16; *Potter* v. *M. Bank*, 28 N. Y. 641; *Hayes* v. *M. L. Ins. Co.*, 125 Ill. 626; *Murray* v. *Stanton*, 99 Mass. 349; *Booth* v. *Powers*, 56 N. Y. 23; Wiltsie on Mort. Fore. § 577; Thomas on Mort. § 1013; *Holden* v. *Sackett*, 12 Abb. Pr. 473; *Benjamin* v. *E. J. & C. R. R. Co.*, 54 N. Y. 675; *E. S. Bank* v. *Brown*, 75 N. Y. 127; Kerr on Real Prop. § 2155; 3 Cook on Corp. 2114, § 888; *Vatable* v. *N. Y., L. E. & W. R. R. Co.*, 96 N. Y. 49; *Carpenter* v. *Catlin*, 44 Barb. 75.)

*Louis Marshall* and *Samuel Untermyer* for respondent. It was the duty of the defendants, under the terms of the 4th and 5th paragraphs of the reorganization agreement, to prepare and adopt a plan of reorganization before the sale of the

mortgaged property, and to afford the plaintiff an opportunity to withdraw its bonds before such sale. (*U. W. W. Co.* v. *O. W. Co.*, 164 N. Y. 44; *Russell* v. *Allerton*, 108 N. Y. 288; *Wright* v. *Remsens*, 133 N. Y. 298; *Robertson* v. *O. E. Co.*, 146 N. Y. 24; *Herrman* v. *M. Ins. Co.*, 81 N. Y. 184; *Paul* v. *T. Ins. Co.*, 112 N. Y. 472; *Kratzenstein* v. *W. Assur. Co.*, 116 N. Y. 54; *Gillet* v. *Bank of America*, 160 N. Y. 549; *Cox* v. *Stokes*, 156 N. Y. 491; *Post* v. *Simmons*, 16 N. Y. S. R. 246.) The provision in the 11th paragraph that the committee is authorized to construe the agreement, and that its construction shall be final, is a nullity and does not operate as a justification or as a defense, or as a permission to the committee to substitute any other contract, arrangement or agreement for that which is embodied in the 4th and 5th paragraphs of the contract; neither does the case present any question under the clause which is claimed to limit defendants' liability to acts of willful misconduct. (*White* v. *M. R. R. Co.*, 135 Mass. 216; *Sanford* v. *C. T. Assn.*, 86 Hun, 380; 147 N. Y. 326; *Matter of N. Y., L. E. & W. R. Co.*, 98 N. Y. 447; *D. & H. C. Co.* v. *P. C. Co.*, 50 N. Y. 250; *Seward* v. *City of Rochester*, 109 N. Y. 164; *Hamilton* v. *L. Ins. Co.*, 136 U. S. 242; *L., L. & G. Ins. Co.* v. *Wolff*, 50 N. J. L. 453; *Mentz* v. *A. F. Ins. Co.*, 79 Penn. St. 478; *Austin* v. *Searing*, 16 N. Y. 112; *Wicks* v. *Monahan*, 130 N. Y. 232.) The case is entirely destitute of any element whereby the plaintiff became estopped by reason of a failure to object to the sale before the filing of a plan, since the evidence discloses one unbroken record of protests on the part of the plaintiff. (*Dolan* v. *D. & H. C. Co.*, 71 N. Y. 285; *Chapman* v. *Erie Ry. Co.*, 55 N. Y. 579; *Durling* v. *Gunther*, 12 Daly, 6; *Brady* v. *Cassidy*, 9 Misc. Rep. 116; *Tholen* v. *B. C. R. Co.*, 10 Misc. Rep. 283; *McGrath* v. *M. L. Ins. Co.*, 6 N. Y. S. R. 376.) The claim that the plaintiff, with full knowledge of the actual sale, required the defendants to perform the very act that has been held to constitute a conversion, is entirely unfounded, and the facts

referred to present none of the elements of estoppel or of ratification. (*Tannenbaum* v. *Armeny*, 81 Hun, 581; *Bennecke* v. *Ins. Co.*, 105 U. S. 360; *Combs* v. *Scott*, 12 Allen, 493; *Owings* v. *Hull*, 9 Pet. 607; *Bright* v. *C., etc., Co.*, 83 Hun, 482; *Camacho* v. *H., etc., Co.*, 2 App. Div. 369; *Thompson* v. *Craig*, 16 App. Div. 29; *C. C. S. B. Co.* v. *Walker*, 66 N. Y. 429; *Smith* v. *Kidd*, 68 N. Y. 142; *Smith* v. *Tracy*, 36 N. Y. 79.) The defendants, by proceeding to a sale of the railroad property without formulating a plan, and under circumstances which prevented the plaintiff from protecting itself by withdrawing its bonds; by using such bonds on the purchase, and by asserting absolute dominion over them, became guilty of such an unwarranted interference with the plaintiff's property right as constituted a conversion. (2 Jaggard on Torts, 716; *Hollins* v. *Fowler*, L. R. [7 H. L.] 757; *Hunt* v. *Bott*, L. R. [9 Exch.] 86; *Barker* v. *Furley*, L. R. [2 Ch. 1891] 172; *Spraights* v. *Hawley*, 39 N. Y. 441; *McCumble* v. *Davies*, 6 East, 538; *England* v. *Cawley*, L. R. [8 Exch.] 126; *Hadley* v. *Mexham*, L. R. [3 Q. B.] 701; *S. G. & E. L. Co.* v. *Hazard*, 55 Hun, 246; 121 N. Y. 677; *Roe* v. *Campbell*, 40 Hun, 49; *Ganley* v. *T. C. Nat. Bank*, 98 N. Y. 487.) The plaintiff had such right of possession and ownership of the bonds which the defendants converted as was necessary for the maintenance of an action of trover. (*Gould* v. *C. C. Nat. Bank*, 86 N. Y. 75; *Stevens* v. *Austin*, 1 Metc. 557; *Kley* v. *Healey*, 127 N. Y. 556; *Bean* v. *A. L. & T. Co.*, 122 N. Y. 622; *E. F. Co.* v. *Hersee*, 103 N. Y. 25; *Hays* v. *Midas*, 104 N. Y. 602; *Dietz* v. *Field*, 10 App. Div. 425.) It was not necessary, in order to charge the defendants with liability for the conversion, to prove a demand and refusal of the bonds. (9 Am. & Eng. Ency. of Law [2d ed.], 210; *Ganley* v. *T. C. Nat. Bank*, 98 N. Y. 487; *Matter of Pierson*, 19 App. Div. 478; *Briggs* v. *Jones*, 8 Misc. Rep. 261; *Ranaus* v. *Hughes*, 19 Misc. Rep. 47; *Fulton* v. *Lydecker*, 17 N. Y. Supp. 451; *S. G. & E. L. Co.* v. *Hazard*, 55 Hun, 251; *Pease* v. *Smith*, 61 N. Y. 477; *Smith* v. *Smalley*, 19 App. Div. 521; *Powell* v. *Powell*, 71 N. Y. 71; *Castle* v.

16

*C. E. Bank*, 75 Hun, 94.) The filing of a plan of reorganization on July 8, 1898, more than six months after the joinder of issue in this action does not affect the plaintiff's right to maintain this suit. (*Wisner* v. *Ocumpaugh*, 71 N. Y. 113 ; *Dean* v. *M. El. R. Co.*, 119 N. Y. 540 ; *Hollingsworth* v. *Flint*, 101 U. S. 591 ; *People* v. *Bank of N. A.*, 75 N. Y. 547 ; *Carpenter* v. *M. L. Ins. Co.*, 22 Hun, 47 ; *Smith* v. *Hartog*, 23 Misc. Rep. 353.) The exclusion by the court of the consents in writing to the reorganization plans filed in July, 1898, by the other bondholders was not error, since they could in no manner affect the plaintiff's rights which had become fixed. (*People* v. *Nostrand*, 46 N. Y. 393.) The fact that the railway property was sold on the mortgage foreclosure at the upset price of $500,000 to the defendants did not conclusively fix the value of the plaintiff's bonds at their proportional share of the balance remaining of the price so paid, after the payment of the expenses of the receivership, receiver's certificates, the foreclosure expenses and the amount of prior liens ; but the plaintiff was justified in presenting for the consideration of the jury other facts bearing on the subject of value. (*K. L. Ins. Co.* v. *Nelson*, 78 N. Y. 145 ; *Campbell* v. *Woodworth*, 20 N. Y. 499 ; *Gill* v. *McNamee*, 42 N. Y. 44 ; *James* v. *Cowing*, 82 N. Y. 449 ; *Kelly* v. *Meiser*, 18 App. Div. 329 ; 2 Sedgw. on Dam. [7th ed.] 403 ; *Ingalls* v. *Lord*, 1 Cow. 240 ; *Decker* v. *Mathews*, 12 N. Y. 313 ; *Potter* v. *Merchants' Bank*, 28 N. Y. 641 ; *Booth* v. *Powers*, 56 N. Y. 22 ; *Thayer* v. *Manley*, 73 N. Y. 305.)

GRAY, J. The action was brought, and a recovery was had, upon the theory that the defendants, by their acts, were guilty of such unauthorized interference, or intermeddling, with the plaintiff's property, as to constitute a conversion. In the language of the plaintiff's brief, it is contended that, "the defendants, by proceeding to the sale of the railroad property without formulating a plan and under circumstances which prevented the plaintiff from protecting itself by withdrawing its bonds ; by using such bonds on the purchase, and

by asserting absolute dominion over them, became guilty of such an unwarranted interference with the plaintiff's property right as to constitute a conversion." In my opinion, there was no case made out of conversion. That there was a breach of the reorganization agreement, in a disregard, or in a disobedience, of one of its provisions, might be assumed;. but that there were present the elements to constitute a conversion, and to give rise to a remedy in tort, I do not believe. The relations between the plaintiff and the defendants rested in contract and were defined by the reorganization agreement. The latter may be regarded as having acted in the capacity, either of bailees, or of agents, (*Carpenter* v. *Catlin*, 44 Barb. 75), and it matters not which, in my opinion, for the purposes of the case. If the acts complained of do not appear to have been wrongful, in the sense that they were unauthorized by, and inconsistent with, the reorganization agreement, then they constituted, at most, a breach of an obligation of that agreement.

It is apparent that the reorganization agreement confers very broad powers upon the reorganization committee, in their management of the bondholders' interest, and it exempts the members from any liability, except in the case of their willful misconduct. A deposit of bonds under the agreement was to transfer to the committee the full legal and equitable title thereto, for all the purposes of the agreement. The committee was authorized to take such steps as it might deem advisable for the formation of a new corporation and for transferring to that new corporation all the assets of the old railway company, and the deposited bonds might be used for the purpose of paying for any assets or franchises purchased. So extensive was the authority of the committee that it might supply any defect or omission, deemed necessary to enable it to carry out the general purposes of the agreement, and its construction of the agreement was to be final.

In what, actually, consists the tortious act of the defendants, which is deemed to give to the plaintiff a right to complain and to maintain this action? It is in the one fact of a

failure to file a plan of reorganization, prior to the sale in foreclosure of the railroad. Concededly, had that been done, there could have been no complaint of unauthorized conduct. It is to be remembered, however, that proceedings to foreclose the mortgage made by the Birmingham, Sheffield and Tennessee River Railway Company had been instituted by the trustee in the mortgage, and were pending at the time of the execution of the reorganization agreement. When, shortly thereafter, a sale was ordered to be held, by the decree of the court, the reorganization committee was confronted with a situation not of their own creating. The committee was called upon to act for the protection of the interests in its care, and if the members construed the agreement as conferring upon them the authority to use the deposited bonds for the purpose of purchasing the mortgaged property, how can it be said that their construction was unwarranted; or that they were not acting for, and in the interest of, the bondholders, their principals, and in the line of duty, for the conservation of their interests? The sale to, and the purchase by, the reorganization committee had the result of liquidating the value of the bonds and of merging them in the ownership of the property. The bondholders, through their committee, got possession of the mortgaged property, as it had been contemplated, and the committee was, thereby, enabled to reorganize the railroad under the authority given it. The formulation of a plan of reorganization might well be regarded as for future consideration. As the price for the property was paid in the bonds, each holder of a certificate, representing the deposited bonds, under the reorganization agreement, became entitled to his proportionate share of the property purchased; which was evidenced by the act of the commissioner of sale, in stamping each bond with the amount it represented of the sum paid for the property. The plaintiff's agent was chargeable with notice of the sale by the public advertisement, as by the letter of the chairman of the committee, and it seems to me clear that it was the duty of the committee to treat the plaintiff's bonds alike with other

deposited bonds and to use them in acquiring the title to the mortgaged property.

Disregarding what I consider to be an erroneous and misleading assumption of fact in the plaintiff's contention, namely, that the defendants proceeded to a sale of the railroad property, and assuming that, by the terms of the reorganization agreement, it was implied that they were bound to formulate a plan for reorganization before the sale in foreclosure, and that, in failing to do so, they violated the reorganization agreement, where was the element of a conversion? Conversion at law is defined to be "an unauthorized assumption and exercise of the right of ownership over goods, or personal chattels, belonging to another, to the alteration of their condition, or the exclusion of the owner's rights." (Bouvier's Law Dict.) A wrongful intention is not an essential element of the conversion and it is sufficient if it appears that the owner has been deprived of his property by the defendant's unauthorized act, in assuming dominion and control. (*Boyce* v. *Brockway* 31 N. Y. 490.) If, in the present case, the defendants were shown to have altered the condition of the plaintiff's property, *without authority*, they might be liable in conversion. (See *Laverty* v. *Snethen*, 68 N. Y. 522, 526; *Comley* v. *Dazian*, 114 ib. 161, 165.) The pivotal point is, whether the defendants exceeded their powers and committed a legal tort; or whether they committed a mere breach of their agreement, in the particular claimed. Their relation to the plaintiff rested in contract and, as it was said in *Walter* v. *Bennett*, (16 N. Y. 250), "whatever responsibility attaches * * * is upon the contract and the plaintiff cannot, by changing the form of his action, change the nature of the defendant's obligation and convert that into a tort, which the law deems to be a simple breach of an agreement." The defendants did not part with the bonds in a way, and for a purpose, not within their authority; for with the assent of the plaintiff they held the legal and equitable title to the bonds for the purposes of the agreement; one of which was to use them in paying for any assets or franchises purchased. It

might be assumed that they exceeded their instructions, in the order of their procedure under the agreement; but that is not enough. (*Sarjeant* v. *Blunt*, 16 Johns. at p. 76.)  There was no unlawful interference with the bonds; for what they did with them was within an apparent authority.  There was no unauthorized assumption of a dominion over them; for, the agreement having vested them with the title thereto for all its purposes, it was within the scope of those purposes that a new corporation should be formed and that the deposited bonds should be used for the acquisition of any assets or franchises necessary to a reorganization of the railroad. The agreement imposed upon them certain obligations; but, at the same time, it relieved them of any liability, except for that arising in willful misconduct. In short, they were given the right to deal generally with the property of the plaintiff, in a scheme of reorganization of the railroad property, and while they might become liable, in contract, for the breach of some obligation, or for negligence in the performance of a duty, they could not, while acting within the apparent scope of their authority under the agreement, become liable in tort, as for a conversion, because a detail of the agreement, however important, was omitted, or disregarded. Even if the result was to change the form of the property, there was no conversion at law; for there was no intention to deprive the owner of its possession or use, or to acquire it for themselves and to derive some benefit from it.  (See Addison on Torts, *501, 502.)

The mortgaged property was about to be sold under a decree in foreclosure; the plaintiff's agent was advised of the sale and, with the bonds remaining with the depositary under the agreement, after the sale, the committee, in using them as they did, was not, in my opinion, guilty of any unauthorized interference.  The situation was that the holders of the certificates representing the deposited bonds were entitled to proportionate shares in the property and franchises purchased. The reorganization committee took the preliminary step of organizing a new corporation, which should take over the

franchises and assets of the old railway corporation, and held the new securities subject to the certificates of deposit. In this the committee performed its duty, as the members construed it to be under the agreement, and if the filing of a plan of reorganization was deferred, or delayed, that did not terminate the agreement, or annul the authority of the committee.

The distinction between this form of action and one upon contract, to enforce a liability for a breach of the agreement, as in an action on the case for misconduct, is apparent and material; for, in the latter form of action, the plaintiff would be obliged to prove that it had been damaged by the defendants' acts; whereas, in the action for conversion, the recovery would be measured by the value of the bonds, irrespective of whether the plaintiff was actually damaged by the defendants' act. That the plaintiff was not damaged by the failure to file a plan of reorganization prior to the foreclosure sale is evident enough. All the stock and bonds of the new corporation were held by the committee for the certificate holders, after the reorganization of the railroad property, and, eventually, they were enabled, through the offer of the Southern Railway Company, to realize upon the basis of each bond, which the certificates represented, the sum of $320, as against the sum of $139.76 from the proceeds of the sale in foreclosure.

A general and careful consideration of this case results in the conclusion that the defendants were acting within the general scope of their authority under the reorganization agreement and, therefore, were not guilty of the conversion charged. In the language of the appellants' brief, "they received on behalf of the plaintiff part payment of an overdue security, as they were authorized to do. They surrendered the bonds (in part), which represented the property and held the property thereafter in their own name, not only without any design to deprive the owner of his right in the property, but for the express purpose of maintaining those rights — the course pursued by them being not only the only

practical way of protecting the plaintiff's rights, but being the course enjoined upon them by the contract of bailment."

For the reasons assigned, I advise a reversal of the judgment and that a new trial be ordered, with costs to abide the event.

WERNER, J. Our views of this case, like those of the majority of the court, require a reversal of the judgment herein and a new trial. But our conclusions are based upon a construction of the contract so utterly at variance with that set forth in the prevailing opinion that we feel constrained to record the considerations by which we think this case should be controlled. This necessitates some repetition of the facts above stated, as well as some additions thereto, in order to emphasize what we regard as the most important features of the reorganization contract. The action was brought for the alleged wrongful conversion of 570 mortgage bonds of the Birmingham, Sheffield & Tennessee River Railway Co. The mortgage securing the bonds was foreclosed and the property sold. The defendants Tod and Leiper were a reorganization committee to whom the bonds in question, with other bonds, were intrusted. On behalf of the bondholders they bid in the railroad at the sale, and used all the bonds in their hands to pay for it. The master who made the sale stamped upon each bond so used a notice that $139.76 had been paid thereon and returned it to the committee. This was the act alleged to constitute a conversion. The trial court held it to be a conversion, because the committee had not filed a plan of reorganization before the sale of the railroad, and this the plaintiff claimed was a breach of the agreement under which they acted.

The history which preceded the alleged conversion may be briefly stated as follows: In 1889, the Birmingham, Sheffield & Tennessee River Railway Co., a corporation duly organized under the laws of the state of Alabama, built and began to operate a railroad in that state from Sheffield to Parrish, a distance of 96 miles. There was also a piece of road running

from Riverton to Riverton Junction on the Memphis & Charleston railroad, having no connection with the main line, except over the Memphis & Charleston railroad. On April 1st, 1889, the Birmingham & Sheffield road executed a mortgage to the Knickerbocker Trust Company of all its property and franchises to secure the payment of five per cent bonds of the denomination of $1,000 to mature on April 1st, 1929, and of which bonds 2,795 were issued. Default was made in the payment of the coupons due October 1st, 1890. On June 6th, 1893, the Knickerbocker Trust Company began a suit to foreclose the mortgage in the United States Circuit Court for the northern division of the northern district of Alabama. The railroad company appeared and admitted the allegations of the bill of complaint, and the court appointed as receiver thereof, Mr. E. A. Hopkins, who had theretofore been its president. The plaintiff, an English corporation having its office in London, had loaned money to Messrs. Dillwyn and Alfred Parish, taking 570 bonds of said railway company as collateral. In December, 1892, the plaintiff sent these bonds to Mr. Samuel Untermyer of New York, who thereafter represented the plaintiff in all matters concerning the same. Mr. Hopkins unsuccessfully endeavored to reorganize the railway. After his efforts in this regard had been abandoned, and on April 9th, 1895, a reorganization agreement was drawn up by which the defendants J. Kennedy Tod, Edmund A. Hopkins and J. G. Leiper were constituted a committee representing the bondholders, and were given very broad powers to represent such of them as should become parties to the agreement and should deposit their bonds with the Manhattan Trust Company as therein provided.

J. Kennedy Tod was a banker and a member of a banking firm, which, in its representative capacity, held 562 of the said bonds, the actual owners of which resided in Scotland and London. Mr. J. G. Leiper was president of the Investment Company of Philadelphia, which held as collateral 804 of these bonds. Mr. Hopkins, as has been stated, had been president of the railroad company, and, at the date of the reorganiza-

tion agreement, was receiver thereof. Under the terms of
said agreement it was provided that the bondholders who
should desire to secure the benefits thereof should deposit their
bonds with the Manhattan Trust Company of the city of New
York, on or before May 15th, 1895. On May 29th, 1895, Mr.
Untermyer deposited the 570 bonds with coupons intrusted to
his care, pursuant to correspondence between him and the
members of the committee, as the result of which the time
limit above referred to was waived. On May 28th Mr. Unter-
myer gave notice of intention to deposit 47 other bonds
belonging to another English client, and these were deposited
after July 17th, 1895, so that the reorganization committee
had then received all but twenty-six of the outstanding bonds.
On May 31st, 1895, Mr. E. A. Hopkins resigned from the
reorganization committee, for reasons which are not material to
any of the issues involved herein, and after his resignation
defendants Tod and Leiper continued to exercise all the powers
of said committee. In May, 1895, before the deposit of the
plaintiff's bonds, Mr. Untermyer called upon Mr. J. Kennedy
Tod at his office. He was there introduced to Mr. William
Tod, who thereafter represented the committee in its dealings
with Mr. Untermyer. On July 1st, 1895, a decree of sale
was entered in the foreclosure suit in the Federal court of
Alabama. It appointed a commissioner and directed him to
sell the property and franchises of the railroad company at
auction upon 60 days' notice, no bid to be received for less
than $500,000. The sale was noticed for September 16th,
1895, and in addition to the notice in Alabama, an advertisement
dated July 13th, 1895, was published in the New York Even-
ing Post. On the same day Mr. Untermyer was advised by
letter from Mr. Tod of the entry of said decree and the date
of the sale. On the 16th of September, 1895, the sale was
made in Alabama pursuant to said decree and under the direc-
tion of the commissioner named therein. The property was
purchased by Messrs. Tod and Leiper, members of the com-
mittee named in the reorganization agreement, at the upset
price of $500,000, of which $50,000 was paid in cash to the

commissioner. On October 15th, 1895, the commissioner
filed his report of sale, and on the 29th of October the court
in Alabama confirmed such sale. On November 22nd, 1895
the Northern Alabama Railroad Co. was incorporated under
the laws of Alabama to run over the line previously operated by
the Birmingham, Sheffield & Tennessee River Railway Co.
On November 29th, 1895, a deed of said railroad was made
by said commissioner to the Northern Alabama Railroad Co.,
which deed recited the foreclosure and sale, the bid by Tod and
Leiper, the report of sale, the ratification thereof, the assign-
ment of the bid made thereon, and conveyed the premises
described in the decree of foreclosure, which included all
the property of the Birmingham, Sheffield & Tennessee
River Railway Co. On the same day the said Northern Ala-
bama Railroad Co. executed a mortgage to the Knickerbocker
Trust Co. conveying all said property and franchises as security
for $3,000,000 bonds, which bonds passed into the hands of said
committee, Tod and Leiper. On November 30th, 1895, the
commissioner named in said decree of sale attended at the
office of the Manhattan Trust Company, in the city of New
York, and stamped upon each of the bonds deposited with
that trust company under the reorganization agreement the
following indorsement: " New York, 29th November, 1895,
$139.76 paid on this bond as part of the proceeds of the sale
under foreclosure. J. Fred Johnson, Commissioner." The
bonds so stamped were returned to the trust company where
they have since remained. The commissioner also deposited
with the Knickerbocker Trust Co. $3,633 in cash, that being
the proportionate share of said purchase price for the 26
bonds which were not represented by the committee. On
October 29th, 1897, this action was commenced. No plan of
reorganization was filed by said committee until July 8th,
1898. Notice thereof was then given to the certificate
holders who came in under the reorganization agreement of
April 9th, 1895, including Mr. Untermyer as trustee.

The following references to and quotations from the reor-
ganization agreement present such portions thereof as are

material to the issues herein : After reciting the insolvency of said Birmingham, Sheffield & Tennessee River Railway Co., the pendency of the foreclosure suit and the receivership therein, the necessity for an organization among the holders of the mortgage bonds and coupons for the protection of their mutual interests and to effect a reorganization of the affairs of the company, "either through or without foreclosure," the agreement provides that the bondholders shall, on or before the 15th of May, 1895, deposit their bonds with the Manhattan Trust Company of New York, with coupons annexed of October 1st, 1892, and all succeeding coupons, and with suitable transfers thereof to bearer in case the same are registered as to principal. It then provides that "the said bonds so deposited shall be held by the Manhattan Trust Company subject to the order and full control of the committee to be used for any purposes under this agreement. The deposit of such bonds shall transfer to the committee the full legal and equitable title thereto for all the purposes of this agreement. The bondholders on depositing their respective bonds shall receive negotiable trust certificates representing their interests." By the second clause Messrs Tod, Hopkins and Leiper, and their respective successors, were constituted a reorganization committee of the railway company and, as such, were given "whatever authority it may be necessary for the committee to exercise in order to legally and efficiently execute the said trust." This paragraph proceeds at length to invest such committee with broad and ample powers to act in behalf of the bondholders in the reorganization of said railroad company, and concludes with the following declaration : "The powers hereinbefore given shall not be narrowed or limited by any enumeration of the powers conferred by this agreement." The third paragraph provides for the filling of vacancies in the committee and for its action by a majority vote or decision of its members. The fourth paragraph is as follows : "*The committee is hereby expressly authorized and empowered, and it shall be its special duty, to prepare and adopt a plan for the reorganization of the affairs of the*

*Railway Company, with or without foreclosure. When the committee shall have adopted such plan, a copy thereof shall be lodged with the Manhattan Trust Company. Notice shall thereupon be given to the holders of the trust certificates given hereunder, and such plan shall become binding upon all of the said holders who do not withdraw herefrom (in the manner hereinafter provided), unless the holders of a majority in interest of the said certificates shall within twenty days after such notice file with the Manhattan Trust Company their written dissent from the plan.* \* \* \*"

The fifth paragraph provides: "*Any holder of a trust certificate issued hereunder may, at any time within thirty days after the mailing to him of notice of the filing of a plan of reorganization as hereinbefore provided, withdraw from this agreement and receive back the bond or bonds deposited by him, upon the payment of his pro rata share of the expenses theretofore incurred by the committee; such payment in no event to exceed one-half of one per cent of the par value of the bonds and overdue coupons represented by such certificate or certificates. Upon the withdrawal of the bonds represented by such certificate or certificates and the payment of his pro rata share of the expenses of the committee, as above provided, the holder of such certificate or certificates shall be thereupon, and without any further act, fully released from the obligations of this agreement and from such plan of reorganization; but as to every certificate holder who does not within the said period of thirty days withdraw the bonds represented by his certificate or certificates, his assent and ratification of the said plan shall be conclusively and finally assumed, conferred and given.*" The sixth paragraph invests the committee with authority to take such steps as may be deemed advisable for the formation of a new corporation and for the transfer thereto of all the assets of said railway company; to purchase the franchises or assets of such new company at any sale thereof for the account and benefit of the bondholders at such price as the committee may deem expedient; to incur such expenses as it may deem judicious and to use the bonds deposited

under the agreement in payment for any assets or franchises purchased; and in case of the purchase by the committee of the whole or any part of the assets or franchises of any railway company, to take a conveyance thereof, or to any other person or persons whom the committee may designate. The seventh paragraph provides for extension of the time within which bondholders of said railway company may accept the benefits of the agreement and for the imposition of such exceptional terms upon any bondholders who may desire to become a party to the agreement after the time limit above referred to has expired, as the committee may deem expedient. By the terms of the eighth paragraph the committee is authorized to borrow money to pay its expenses, or make a cash payment on any sale of the assets or franchises of the railway company, or for any other purpose authorized by the agreement or to be adopted thereunder; and for that purpose to pledge any or all of the deposited bonds. The committee is also given a lien upon such of the assets of the railway company which it may purchase and on any other assets coming into its hands, for its reasonable expenses and compensation, and for any liabilities properly incurred by it.

By the ninth paragraph the committee is authorized to appoint sub-committees, counsel, agents, experts or other employees, and to pay reasonable compensation for their services, and to incur such other expenses as shall in the opinion of the committee be necessary to carry this agreement into effect. The tenth paragraph gives the members of the committee the right as individuals to become parties to the agreement as bondholders, and entitled to all the rights and benefits accruing to any other bondholder; to become pecuniarily interested in any of the property or matters which are the subject of the agreement; to become stockholders or directors in any new corporation that may be formed to acquire the assets or franchises of the railway company and to become members of any syndicate formed in connection therewith. It also provides for the reasonable compensation of the committee for its services, together with all expenses or outlays

incurred in carrying out the agreement, all of which are made charges upon the bonds deposited under it and upon the interests of the bondholders respectively in the assets and franchises of the railway company. The eleventh paragraph reads as follows : " *The committee may supply any defects or omissions which it may deem necessary to be supplied to enable it to carry out the general purposes of this agreement. The committee is authorized to construe this agreement, and its construction of the same shall be final.* ＊ ＊ ＊ " The twelfth clause provides, among other things, that no member of the committee shall be liable for the acts of any other member, nor for anything but his own willful misconduct.

The basic question in the case is whether the courts below have correctly construed the reorganization agreement. The learned trial court held, as matter of law, that the agreement did not become effective and binding upon the plaintiff until the defendants, the reorganization committee therein named, had prepared and adopted a plan for reorganization, and had given notice thereof to the plaintiff, unless the latter had waived these essential preliminaries by its alleged ratification of the acts of the defendants. This view of the agreement was adopted by the learned Appellate Division, and we think this question of construction has been correctly decided.

The agreement, it is true, contains no express provision for the preparation and adoption of a plan for reorganization at any particular time, nor for the performance of the duties imposed upon the defendants in any categorical order. This fact is not decisive of the question. The very purpose of the agreement and the sequence of its arrangement compel the implication that there was to be no binding agreement until the depositing bondholders had been given the opportunity to decide whether they would abide by the plan· adopted by the defendants or withdraw therefrom, and this decision could not be made until the plan had been prepared, adopted and promulgated. Any other view of this agreement would render it a meaningless mass of verbiage employed to express the single idea that the defendants were to be clothed with abso-

lute power to do as they pleased. Defendants lay great stress upon the provision that " the deposit of such bonds shall transfer to such committee the full legal and equitable title thereto for all the purposes of this agreement." What are the purposes of the agreement ? To effect a reorganization of the railway company which had defaulted in the payment of interest upon its bonds. How was that to be accomplished ? By the appointment of a committee to whom, as custodians, the bondholders were to transfer their bonds, with the privilege of withdrawing them if the plan for reorganization adopted by the committee was not satisfactory. When was this plan to be prepared and adopted ? It would transgress the limits of intelligent credulity to suppose that this important feature of the transaction was to be deferred until dissent from the plan would be an idle formality and withdrawal from participation therein an impossibility. The language of the agreement is that " when the committee shall have adopted such plan, a copy thereof shall be lodged with the Manhattan Trust Company. Notice shall thereupon be given to the holders of Trust Certificates issued thereunder, and such plan shall become binding upon all of the said holders *who do not withdraw herefrom* (in the manner hereinafter provided) unless the holders of a majority in interest shall within twenty days after such notice file with the Manhattan Trust Company their written dissent therefrom.  *  *  *  Any holder of a Trust Certificate issued hereunder may at any time within thirty days after mailing to him of notice of the filing of a plan of reorganization, as hereinbefore provided, withdraw from this agreement, *and receive back the bond or bonds deposited by him,*  *  *  * and upon such withdrawal the holder of such certificate or certificates shall be thereupon, *and without any further act, fully released from the obligations of this agreement and from such plan of reorganization.*" If, under this language, the adoption of a plan by the committee, and the right of the certificate holder to withdraw therefrom, were not to eventuate before the foreclosure sale, when were they to occur ? The sale took place on the 16th of September,

1895. The plan for reorganization was not filed until July 8th, 1898. Meanwhile, and on November 29th, 1895, plaintiff's bonds had been applied by the defendants to the purchase price of the railroad upon the sale under foreclosure. It is urged on behalf of the defendants that the powers conferred upon them as such committee were extremely broad and ample; that they were authorized to take such steps as they might deem advisable in the reorganization of the railway company; that they might, if they should so decide, form a new corporation and transfer to it all the property of the old corporation; and that no member of the committee was liable for anything except "his own willful misconduct." There are two simple answers to this contention. The first is that none of these ample powers, behind which the defendants seek to shield themselves, were ever really conferred upon them because they failed in the performance of the condition precedent upon which the vesting of these powers was dependent. The second is that, in any view of this agreement, the duty to prepare, adopt and promulgate a plan for reorganization was one which obviously should have been performed while it was yet possible for the certificate holders to withdraw from such plan, and to take other steps if so advised. As to these defendants the various provisions of the reorganization agreement are to be strictly construed. No general powers are to be implied in their behalf, and express powers are not to be extended by construction. (Cook on Corporations, sec. 888; *United Water Works Co. v. Omaha Water Co.*, 164 N. Y. 41.) The only reasonable construction that can be given to the clause which imposes upon the committee the duty to prepare and adopt a plan for reorganization, and to give notice thereof to the certificate holders, is that this was to be done before the foreclosure sale. These conditions are not affected by that clause of the agreement which provides that the committee is authorized to construe the same and that its construction thereof shall be final. Every duty imposed and every power conferred by this agreement was based upon the implied trust that it should be fairly construed

17

and honestly executed. In matters of detail concerning the
mere form or method of procedure, the committee had ample
and undoubted latitude of construction and execution. But
the adoption of a plan for reorganization involved much more
than that. It was the very basis upon which the rights of
the bondholders rested. There was to be no binding agree-
ment until a plan had been adopted and the subscribing bond-
holders had signified their assent thereto, either expressly, or
by their failure to withdraw therefrom within the time limited
for that purpose. To concede to the committee the arbitrary
power to place its own construction upon this essential and
vital part of the agreement would constitute it the judge and
jury in its own case. Suitors are not thus summarily to be
deprived of their rights, nor courts ousted of their jurisdic-
tion. "Unless railroad * * * committees are to be put
above the Constitution, the trustees cannot set aside and change
their contract with plaintiff of their own volition and without
his consent." (*Hollister* v. *Stewart*, 111 N. Y. 644.) This
branch of the discussion may be summed up in a single sen-
tence. Our construction of this agreement precludes the
possibility of a different construction by the committee.

It is further urged for the defendants that even if they
were mistaken as to their powers under the agreement yet, by
the express terms thereof, they are to be liable only for their
willful misconduct. If, in the consideration of the question
before us, we were concerned with motives instead of results,
it might be profitable to enter into a discussion as to the pre-
cise meaning of the term "willful misconduct." But if, as
we have seen, the defendants took the risk of giving to the
agreement a construction that was utterly unauthorized, no
interpretation we might place upon their motives could save
them from the consequence of their acts, because they have
subjected themselves to the legal imputation of "willful mis-
conduct" even though they may have been guiltless in their
intentions. When, by necessary and unavoidable implication,
a provision must be read into a contract, it becomes as much
a part thereof, and is quite as forceful and binding, as one of

its written stipulations.  As applied to such a case the language of this court in *Cox* v. *Stokes* (156 N. Y. 491), and quoted with approval in *United Water Works Co.* v. *Omaha Water Co.* (164 N. Y. 41), is appropriate and significant. "If they (the committee) had power to modify or dispense with this stipulation, they had the power to disregard the agreement in every particular and to enter into a new and wholly inconsistent contract without the consent of the bondholders for whom they were acting.  They could thus set aside and subvert the very instrument which was the source of all their power.  It is idle to claim that they could change or dispense with an express stipulation of the agreement, or that in doing so they acted in good faith.  Even if they acted in good faith as matter of fact, they are presumed to have acted in bad faith as matter of law."

The next step in logical progression is to determine the effect of defendants' use of plaintiff's bonds to apply upon the purchase price of the railroad at the foreclosure sale.  A brief *resume* of the facts pertinent to this phase of the case will give us a clearer perspective of the question.  The reorganization agreement was executed in April, 1895.  The plaintiff deposited its bonds thereunder in July.  This deposit was made subject to the conditions contained in the fourth and fifth paragraphs of the agreement, providing that the plaintiff could receive back its bonds and withdraw from the agreement at any time within thirty days after receiving notice of the filing of a plan of reorganization.  This provision, as we have said, required the adoption and filing of a plan before the sale. The sale took place on the 16th day of September, 1895. The defendant purchased the property, and on the 30th day of November, 1895, used the plaintiff's bonds as a part of the purchase price.  No plan for reorganization had been adopted or filed.  If this was not an unlawful and unauthorized assumption of ownership and use of plaintiff's property by the defendants what was it?  It is said that it was a breach of the agreement.  It was all that and something more.  Up to the instant that the defendants used the plaintiff's bonds to

pay for the railroad there had been nothing more than a breach of the agreement. After that there was the breach of the agreement plus the conversion. But the defendants insist that there could be no conversion because they were lawfully in possession of the bonds under the "legal and equitable" title given them by the agreement. The only title they had in these bonds was for the specified purpose of holding the same as custodians or bailees until the plaintiff should be given notice of the adoption and filing of a plan for reorganization, and until the expiration of the time limited for its withdrawal from the agreement, in case it was not satisfied with the plan. So long as these essential prerequisites remained unfulfilled the defendants never obtained title to the bonds for any of the other purposes specified in the agreement. The books are full of definitions of this particular form of tort, but we have found none that is more concise, and yet comprehensive, than the following: "The act of conversion is the distinct, unauthorized and positive assumption of the powers of the true owner." (2 Jaggard on Torts, p. 716.) The same learned author divides acts of conversion into four classes. (1) Wrongful taking of property. (2) Wrongful parting with it. (3) Wrongful retaining of it. (4) Wrongful destruction of it. We will adopt this classification for the purposes of our discussion. There was no wrongful taking, retention or destruction of plaintiff's property by the defendants. The elimination of these factors leaves but one other, which is expressed in the question: Did the defendants wrongfully part with the plaintiff's property? The defendants, through their depositary, the Manhattan Trust Company, came into possession of the plaintiff's bonds for a specified purpose which was antecedent to, and controlling of, the succeeding or consequent purposes set forth in the reorganization agreement. That antecedent purpose was to hold the bonds until the adoption and promulgation of a plan for reorganization, subject to plaintiff's right to disapprove of the plan, to withdraw from the agreement and to receive back its bonds. That was the specific and limited authority

conferred upon the defendants until the plaintiff, either by its
express assent or by its silence for thirty days after receiving
notice of the adoption of such plan, should acquiesce in the
exercise, by the defendants, of the further powers set forth
in the agreement.    This preliminary duty the defendants
never performed, and, therefore, they never acquired the
right, as against the plaintiff, to exercise any of the subse-
quent powers, or to dispose of plaintiff's bonds.   The defend-
ants were simple bailees, invested with naked possession
until the happening of a specified event which never
occurred until after they had parted with the bonds.  How
did they part with them?  By turning them over to the
master in chancery as part payment of the purchase price of
the railroad upon the sale under foreclosure.   The bonds
were thus as effectually parted with as though they had been
sold or canceled after payment.    It is simply begging the
question to argue that the bonds were never actually taken
from the possession of the Manhattan Trust Company ; that
they are there now ; that the plaintiff can still have them or
exchange them for other securities which are worth much
more.    The fact remains that the bonds were used to pay for
a railroad bought by the defendants without the plaintiff's
authority or consent.    The indorsement of payment thereon
destroyed their value as bonds and left the plaintiff with no
securities.    It had, of course, the option to close its eyes upon
this unlawful use of its property and to take its allotment of
any new securities issued by the reorganization railroad com-
pany, but behind all this was the absolute right to have its
property returned in its original form unless it was used in
the manner and for the purpose for which the bailment was
made.    Defendants seem to think that plaintiff's failure to
object to the sale, and the subsequent opportunity of the
bondholders to realize, out of the new securities, much more
than the value of the bonds at the time of the conversion, are
circumstances which affect the question whether there was a
conversion or not.    Defendants were undoubtedly guilty of a
breach of the agreement in failing to prepare and adopt a

plan for reorganization before the foreclosure sale. For this breach the plaintiff could have maintained an action to recover such damage as it had sustained and could establish by proof. The failure to do this did not, however, authorize the defendants to proceed still further in disregard of the plaintiff's rights and had no effect upon the subsequent conversion of its bonds. It is equally apparent that the question of conversion is not affected or controlled by the later value of the substituted securities. The right of the plaintiff, and the liability of the defendants became fixed at the instant of conversion. Plaintiff was not bound to accept other bonds, secured by another mortgage given by a different railroad company, unless it chose to do so, and, having declined, we are not concerned with the question of its loss or gain in the transaction. The following cases illustrate the principle which supports the plaintiff's claim of a conversion of its bonds: In *Laverty* v. *Snethen* (68 N. Y. 522) the plaintiff indorsed and delivered to the defendant a promissory note, taking a receipt therefor, which stated that it was received for negotiation, and that the note, or the avails thereof, would be returned on the next day. Plaintiff instructed the defendant not to let the note go out of his reach without receiving the money. Defendant delivered the note to a third person upon the latter's promise to get the note discounted or return the money. This third person took the note, procured it to be discounted and appropriated the proceeds. Upon these facts this court said: "If an agent, intrusted with the property of his principal, parts with it for a purpose not authorized, he is liable for a conversion, although there was no wrongful intent on his part." In that case it was made clear that the owner of the property has the right to part with so much of the dominion thereof as he pleases, and when there is a partial or qualified relinquishment of dominion, coupled with conditions, upon the performance of which the passage of further dominion is made to depend, such conditions are an essential and controlling element of the transaction. The cases cited in support of that conclusion are applicable here. In the leading case of *Syeds* v.

*Hay* (4 T. R. 260) it was held that trover would lie against the master of a vessel who had landed plaintiff's goods contrary to his orders, though the plaintiff might have had them by sending for them and paying the wharfage. In *Spencer* v. *Blackman* (9 Wend. 167) the plaintiff gave the defendant his watch to have its value appraised by a watchmaker. Defendant delivered it to the watchmaker, and while in his possession it was levied upon under an execution not against the owner. The defendant was held liable in conversion because, as the court said: "The watch was intrusted to him for a special purpose to ascertain its value. He had no orders or leave to deliver it to Johnson, the watchmaker, nor any other person." In *Scott* v. *Rogers* (31 N. Y. 676) the defendant, a factor in Buffalo, was directed to sell wheat at a specified price on a particular day, or ship it to New York. The factor did not sell or ship the wheat on that day, but sold it at the price named on the next day. It was held that this was, in legal effect, a conversion. In *Boyce* v. *Brockway* (31 N. Y. 490) it was held that the sale by the defendant of butter which belonged to the plaintiff was an assumption of dominion in hostility to the rights of the owner, and was, in law, a conversion. In *Comley* v. *Dazian* (114 N. Y. 161) the plaintiff executed a bill of sale of certain goods, absolute in form, but which was intended merely as security. At the request of the plaintiffs, the vendee executed a bill of sale to the defendant. This was done under an arrangement that the defendant should take possession of the goods and, with the consent and approval of the plaintiffs, and not otherwise, sell them and distribute the proceeds among plaintiffs' creditors as directed. Defendant sold the goods and retained the proceeds. It was held that he was guilty of conversion. In *Hynes* v. *Patterson* (95 N. Y. 3) the plaintiff delivered notes to the defendant's testator, under an agreement that they were to be discounted for the benefit of the latter, and, after paying the plaintiff ten per cent of the proceeds, the balance was to be appropriated to the liquidation of an indebtedness upon real estate which was to be conveyed to defend-

ant's testator and bonded.    Two-fifths of the bonds were to be held by said testator in trust as security for the payment of the notes.    If the notes were not paid the bonds were to be given to the plaintiff.    The ten per cent was paid to the plaintiff, the notes were disposed of in the purchase of personal property and never appropriated to the liquidation of the real estate indebtedness, nor were any bonds issued as required by the agreement.    It was held that this unauthorized use of the notes was a conversion thereof.    Further multiplication of the authorities along this line would seem to be superfluous.    The foregoing cases are, of course, distinguishable from the class in which the bailee, having authority, does an act which is merely in excess thereof but not inconsistent therewith.    Thus, if a broker being authorized to sell goods for a certain price, sells them at a lower price, he is not liable in trover (*Dufresne* v. *Hutchinson*, 3 Taunton, 117), the distinction being, as pointed out by CHURCH, Ch. J., in *Laverty* v. *Snethen* (*supra*), that in the latter case the broker or agent had the right to sell and deliver the property.    He disobeyed instructions as to price and was liable for misconduct, but not for trover.    To the same effect is *Sarjeant* v. *Blunt* (16 Johns. 74).    In the case at bar the use of the plaintiff's bonds was inconsistent with the purposes for which they had been deposited.    At the time they were used the defendants had not discharged the duty upon the performance of which the right to such use depended. This use of the bonds by the defendants was, therefore, an unauthorized and unlawful exercise of dominion over plaintiff's property and in derogation of its rights.    This was a conversion.

Defendants also contend that even if the act complained of was a conversion, an action of trover cannot be maintained because plaintiff had neither title, possession nor the right to possession of the bonds, and, in any event, could only maintain this form of action after rescission of the contract and after demand and refusal.    It is a well-settled rule that no demand is necessary before commencing an action in trover where there has been an actual conversion and it can

be proved, for demand and refusal are only evidence of conversion. (*Ganley* v. *Troy City Nat. Bank*, 98 N. Y. 487; *Saratoga G. & El. L. Co.* v. *Hazard*, 55 Hun, 251; affd., 121 N. Y. 677; *Pease* v. *Smith*, 61 N. Y. 477.) Nor was the plaintiff under any duty to rescind the reorganization agreement, or to return its trust certificate before it could bring this action. There was no fraud in the agreement and, therefore, no right or duty of rescission. The trust certificate, although negotiable in form, was in reality simply a receipt certifying to the deposit of bonds for a specified purpose. It neither conferred nor took away any rights which the plaintiff had, and when the bonds which it represented had been used in contravention of the fair and obvious meaning of the agreement, the plaintiff had the right to treat it as worthless for any purpose except as evidence of the deposit of its bonds. If, before the trial of this action, the plaintiff had made use of the trust certificate for any purpose inconsistent with the repudiation of the reorganization agreement, such use would, of course, have destroyed the plaintiff's right of action and, in that event, the Manhattan Trust Company, as depositary, would have been protected in its recognition of any proper claims founded upon the negotiability of the certificate. (*Bean* v. *Am. L. & T. Co.*, 122 N. Y. 623.) The plaintiff's production and proof of the certificate upon the trial, supplemented by the silence of the defendants upon that subject, was evidence that it had been used for no purpose inconsistent with plaintiff's claim that the defendants were to be treated as the owners of the bonds and that the plaintiff was entitled to recover their value. If, notwithstanding these conditions, the defendants deemed it necessary for their protection to have actual possession of the trust certificate, either themselves or through their depositary, they could have demanded, and would undoubtedly have received, such possession when judgment went against them.

It is also urged, on behalf of defendants, that the plaintiff has ratified the acts of the defendants and is estopped from repudiating the same. So far as the decision of this question

depends upon the conflicting oral testimony of Messrs. Unter-
myer and William Stewart Tod it presents a question of fact
which has been settled in plaintiff's favor and is binding upon
this court. As to the correspondence upon which the defend-
ants rely in this behalf, we feel bound to say that it estab-
lishes neither acquiescence nor ratification. On May 28th,
1895, the plaintiff, through his counsel Mr. Untermyer,
wrote "may I further ask that when you have formu-
lated the lines of a plan of reorganization, you will kindly
advise me before the plan is formally issued." On June
14th, 1895, plaintiff's counsel addressed another letter to the
committee stating, in substance, that his client was asking
for further information in respect to the matter and for
representation on the committee, in view of Mr. Tod's resig-
nation, "so that when the time arrives for formulating a plan
we may have a voice in the matter." On July 9th, 1895,
plaintiff's counsel sent a third letter to the committee stating
that the plaintiff desired to know "if any plan of reorganiza-
tion has as yet been drafted or suggested," and asking to be
advised "whether such a plan is now under consideration and
how soon they are likely to be advised of its details." To the
last letter the defendants replied on July 16th, 1895, stating
"a decree of sale has been entered. The property is now
being advertised for sale and will, I understand, be sold upon
the 16th day of September. No plan has yet been adopted,
and I am unable to predict the probable date upon which a
plan will be issued, but I have not forgotten your request to
be advised of it in advance." On the 26th of October, 1895,
plaintiff again wrote, saying "I am still without information
as to what has been done with this property or toward the
formulation of the plan of reorganization which was to have
been announced some time ago. Will you kindly advise me
at your early convenience as to when we may expect to be fur-
nished with a definite plan and what is being done about it?"
On the 23rd day of November, 1895, after plaintiff's counsel had
learned of the sale under foreclosure, he wrote to the defendants
asking to be advised if the new corporation which the defend-

ants had caused to be formed had any relation to the putting forth of a plan of reorganization ; when such a plain might be expected ; and whether the defendants intended to transfer the property without notice to, or assent by, the plaintiff. We quote the parts which are definitive of plaintiff's position. " As heretofore explained to Mr. William Tod, we have felt that the agreement contemplated the issuance of a plan before the sale, with the opportunity of withdrawal under the terms of the agreement to such of the bondholders as might desire to do so. *    *    * Upon our construction of the agreement the committee now hold the property which they purchased at the sale, which was had without notice to us, as trustees for the bondholders. If, when the plan is promulgated, it fails to meet with our satisfaction, we are not, in my judgment, relegated to the acceptance of the infinitesimal sum named in the decree as the upset price which Mr. William Tod seemed to regard as our only alternative." Having received no answer to the last letter, plaintiff's counsel again wrote to the defendants on November 30th, 1895, stating " Information has come to us to the effect that the committee is about to convey the property in its hands to the North Alabama Railway Company, notwithstanding the protests made by me on behalf of the Industrial & General Trust, Limited, and the other bondholders whom we represent. Will you kindly advise me if this information is accurate ? On our construction of the reorganization agreement the committee has no such authority." November 30th, 1895, was the day on which the defendants converted the plaintiff's bonds. The length of the subsequent correspondence precludes its reproduction here. It is enough to say that in all of his letters, written after November 30th, 1895, plaintiff's counsel persistently and consistently maintained that defendants' use of plaintiff's bonds, without having first made and filed a plan for reorganization, was a violation of the agreement and that no correspondence entered into, with a view of avoiding possible litigation, should be considered as a waiver of plaintiff's rights in the premises. The

letters written on plaintiff's behalf, instead of establishing ratification of, or acquiescence in, the unauthorized acts of the defendants, show a constant and continuing protest which found characteristic expression in the final letter of July 20th, 1898, in which plaintiff's counsel said, " My client's claim is, as you know, that the committee had no authority to use their bonds in purchasing the property. They will do nothing to affect their rights in the pending litigation." Neither in the context of this correspondence, nor in the oral evidence by which it is connected and supplemented, do we find any support for defendants' claim of ratification or acquiescence. The argument that the sale of the railroad was regularly conducted under judicial sanction, and was not brought about by the defendants ; that the plaintiff knew as early as July 16th, 1895, that a decree of sale had been entered directing a sale on September 16th of that year and that plaintiff entered no protest, is really not germane to the question of ratification or acquiescence. It is true that the conditions which precipitated the foreclosure sale were not of defendants' choosing, but they were the creators of the situation presented by the reorganization agreement. The plaintiff had the right, in the first instance, to assume that a plan for reorganization would be adopted and filed before the sale. When the sale took place, without the previous adoption of a plan, the plaintiff was not bound to assume that its bonds would be used without its consent. The defendants, notwithstanding their breach of duty, could still have adopted a plan which the plaintiff could have approved or rejected. Approval would, of course, have implied waiver of previous wrong, but rejection would have left the plaintiff free to reclaim its bonds, to withdraw from the agreement, and to take such steps with reference to the breach of the agreement, or the reopening of the sale, as the exigencies of the situation would have suggested or permitted. There was no acquiescence before the sale, and there has been no ratification since the sale. The failure of plaintiff to withdraw from the agreement when a plan for reorganization was filed in July, 1898, or at any previous time, did not make the

agreement binding upon it. By converting the plaintiff's bonds on November 30th, 1895, the defendants abrogated the agreement as to the plaintiff. The plaintiff's right and the defendants' liability became fixed on that day. It is, moreover, an elementary rule that in actions at law judgment is rendered upon the situation which exists at the time of the commencement thereof, and not at the time of the trial. The next question for our consideration is whether the proper rule of damages was applied. The plaintiff was permitted, under the objection and exception of the defendants, to prove the value of the Birmingham, Sheffield & Tennessee River Railway Co. prior to the foreclosure sale as the basis upon which to assess the value of the plaintiff's bonds at the time of the conversion thereof by the defendants. Under this ruling the question of damages was submitted to the jury and plaintiff had a verdict of $355,000. In actions of trover the value of the property, at the time of its conversion, is the usual measure of damages. This rule has its exceptions which need not be considered here. What was converted? The plaintiff's bonds, When were they converted? After the sale in foreclosure. What did the bonds then represent? Simply their proportionate part of the proceeds of the sale. The railroad had been sold for $500,000, and each bond of $1,000 was, therefore, worth $139.76. The total amount of the plaintiff's bonds upon this basis was $79,663.20. It is to be remembered that the sale under foreclosure was, as far as we are advised, regular and lawful. It was the culmination of a judicial proceeding which stands unassailed. While the defendants had violated the reorganization agreement in not adopting and filing a plan previous to the sale, that had no effect upon the regularity of the proceedings in the foreclosure suit, or upon the sale itself. In this respect the case at bar differs from *James* v. *Cowing* (82 N. Y. 456), relied upon by the plaintiff. That action was based upon an alleged breach of trust; the sale by the trustee was held to be unlawful and the plaintiff's damages were held to have been properly measured by the recovery of his proportionate share of the value of the prop-

erty as fixed by the price which it brought under a prior fore-closure sale. That is precisely the measure of damages which should have been applied here, although the form of action and facts are different. The bonds were secured by the mortgage. Up to the time of sale the value of the property was the value of the mortgage. Upon the sale the mortgage was extinguished and the proceeds of sale took its place. The plaintiff while repudiating the reorganization agreement did not attack the sale, and its recovery in this form of action, therefore, must be limited to its share of the proceeds of sale. Thus we have the anomalous result that plaintiff's refusal to acquiesce in or ratify the wrong of the defendants leaves it in a worse position than those bondholders who have deemed discretion the better part of valor, in accepting the substituted securities offered them by the defendants. The plaintiff gets $139.76 upon each bond. Its more complacent associates receive securities worth more than twice as much. This result is inevitable in the case at bar, although it might possibly be avoided under a complaint based upon defendants' breach of contract supplemented by proof of plaintiff's actual damages.

Since our conclusion upon the question of damages is that the ruling of the courts below was fatally erroneous, and necessitates a new trial, we refrain from discussing the incidental exceptions which, under a different ruling as to damages, might be interesting and important.

The order of the Appellate Division should be reversed and a new trial granted, with costs to abide the event.

O'BRIEN and LANDON, JJ. (PARKER, Ch. J., and HAIGHT, J., in the result on the ground that the failure to make a plan and give notice thereof before using the bonds to pay the purchase price was not a conversion, but a breach of contract), concur with GRAY, J.; CULLEN, J., concurs with WERNER, J.

Judgment reversed, etc.