EUGENE McGREEVEY, Plaintiff, *v.* NEW YORK CENTRAL RAILROAD COMPANY and Another, Defendants.

EUGENE McGREEVEY, Plaintiff, *v.* NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

Supreme Court, Onondaga County, March, 1932.

*Frank M. Hennessy,* for the plaintiff.

*Hiscock, Williams & Cowie* [*Daniel Scanlon* of counsel], for the defendants.

Ross, Official Referee. The facts out of which these two actions arose are as follows: The New York Central Railroad Company owns in the village of Newark, N. Y., along and as a part of its right

of way, a strip of land. In or about March, 1925, the said railroad company leased to the plaintiff certain portions of the aforesaid strip, which lease provided with other matters that upon the termination of said lease all alterations, additions or improvements made by either of the parties hereto, except movable furniture, shall remain upon and be surrendered with the premises.

In fact, the plaintiff in these actions also had a lease or permission of a certain firm or corporation known as Cleveland & Sons who were also lessees of certain premises from the defendant, the railroad company. In fact, the equipment involved in these actions is upon the premises leased by the firm or corporation of Cleveland & Sons.

The parties in these two actions were mistaken in the location of the plaintiff's two machines, believing that they were located on land leased by the plaintiff from the railroad company, when in fact they were upon land leased by the plaintiff from Cleveland & Sons.

In the conversion action plaintiff alleges ownership and that the defendant wrongfully took and converted the property. The defendant denies the allegations, except that it admits the demand alleged and also admits that the defendant refused to deliver the chattels, and also alleges that the lease between the parties hereto had expired and that by reason of the clause referred to that the chattel had become a part of the real property. The claim that the property became a part of the realty by annexation was abandoned upon the trial. The question presented in both actions was whether the interference of the defendant constituted a conversion. The defendant claims under its general denial that the plaintiff has failed to make out a case in either action.

Not every wrongful interference with the chattel of another will constitute a conversion. There must be an attempt to deprive the owner or person entitled to possession of his general right and dominion over his chattel.

*Fouldes* v. *Willoughby* ([1841] 8 Mees. & W. 540). The defendant was the manager of a ferry. The plaintiff had embarked on board the defendant's ferryboat having with him two horses, for the carriage of which he had paid the usual fare. " It was alleged that the plaintiff misconducted himself and behaved improperly after he came on board the steamboat, and when the defendant came on board he told the plaintiff that he would not carry the horses over, and that he must take them on shore. The plaintiff refused to do so, and the defendant took the horses from the plaintiff, who was holding one of them by the bridle, and put them on shore on the landing slip. They were driven to the top of the slip, which was separated by gates from the high road, and turned loose on the road. They were shortly afterwards seen in the stables of an hotel  *  *  *

kept by the defendant's brother. The plaintiff remained on board the steamboat, and was conveyed over the river. * * * " The plaintiff was notified that he might have the horses upon sending for them and paying for their keep and that if he did not send for them they would be sold to pay the expense. ROLFE, B., said in part: " In all cases on this subject, there has been proof of a trespass having been committed; but there was a further question, namely, whether there was not a conversion also. In every case of trover, there must be a taking with the intent of exercising over the chattel an ownership inconsistent with the real owner's right of possession."

The verdict for the plaintiff was set aside for misdirection, but Lord ABINGER in writing states as follows: " If the Judge had told the jury that there was evidence from the case from whence they might infer that a conversion of these horses had taken place at some time, it would have been different; " but the direction of the trial judge that the " act of putting them on shore amounted to a conversion, I think was a misdirection, on which the defendant is entitled to a new trial."

ALDERSON, B.: " I am of the same opinion * * * Any asportation of a chattel for the use of the defendant, or a third person, amounts to a conversion; for this simple reason, that it is an act inconsistent with the general right of dominion which the owner of the chattel has in it, who is entitled to the use of it at all times and in all places. When, therefore, a man takes that chattel, either for the use of himself or of another, it is a conversion. So, if a man has possession of my chattel, and refuses to deliver it up, this is an assertion of a right inconsistent with my general dominion over it, and the use which at all times, and in all places I am entitled to make of it; and consequently amounts to an act of conversion. * * * But the question here is, where a man does an act, the effect of which is not for a moment to interfere with my dominion over the chattel, but, on the contrary, recognising throughout my title to it, can such an act as that be said to amount to a conversion? I think it cannot. Why did this defendant turn the horses out of his boat? Because he recognized them as the property of the plaintiff."

In the case of *Industrial & General Trust v. Tod* (170 N. Y. 233, on p. 245), GRAY, J., writing, states as follows: " Conversion at law is defined to be ' an unauthorized assumption and exercise of the right of ownership over goods, or personal chattels, belonging to another, to the alteration of their condition, or the exclusion of the owner's rights.' * * * A wrongful intention is not an essential element of the conversion and it is sufficient if it appears that the owner has been deprived of his property by the defendant's unauthorized act, in assuming dominion and control." (*Boyce* v.

*Brockway*, 31 N. Y. 490; *Pease* v. *Smith*, 61 id. 477, 481, in which the case of *Fouldes* v. *Willoughby* is cited.)

The freight agent of the defendant railroad company from October, 1925, was the witness Herbert P. Van Dusen, his immediate predecessor was one George H. Butts, and the plaintiff in his evidence refers to the freight agent with whom he dealt as Mr. Butts. As the part in this controversy enacted by the freight agent may be important, I will briefly refer to his connection herewith. The plaintiff testifies that prior to 1925 he had, as he terms it, " done lots of business with the Freight Agent," apparently relating to shipments of material only (S. M. pp. 13, 15). That in the early part of 1925 he had talked with the freight agent relative to obtaining a lease from the New York Central (pp. 13, 14). After the plaintiff had obtained the lease, the freight agent pointed out the property " I was to occupy under the lease " (p. 15). " But, after the talks with the Freight Agent we took it up with the New York Central direct " (p. 15); that he had talked with the freight agent in July, 1926, in reference to the removal of the bins (*i. e.*, the property replevined, pp. 17, 18, 19). The plaintiff testifies (p. 19): " Well, I went up to see Mr. Butts. Mr. Butts told me I could remove all the loose equipment but I couldn't take the bins; that he was instructed by the Railroad Company not to allow me to remove the bins."

The statement of the freight agent to the plaintiff, if authorized by one having authority, was a ministerial act. In other words, if the freight agent had the right to act as a messenger for the defendant company's officers, his acts in delivering the message within the apparent duty of such messenger so far as the person sending such message was authorized would bind the company.

In determining whether there was a conversion of the machines which the plaintiff seeks to recover, I have the right to consider the surrounding circumstances not necessarily controlling but as helpful in determining the rights of the respective parties. It is a fact that the machines were at the time of the commencement of this action upon land belonging to the defendant, but that such land was at the time leased to Cleveland & Sons, who in turn leased to the plaintiff. It also is a fact that at the time of the alleged conversions both parties to this action supposed that the machines were upon land which the plaintiff had leased from the defendant. It also admits of no dispute that the machines in question were both heavy and cumbersome and could not, like an ordinary chattel, be quickly and easily removed. It is claimed by the plaintiff that he sent men to remove the machines, or at least one of them, the " sand batcher," and it is also claimed that some one claiming to represent the defend-

ant forbade these men from removing the machine. From the foregoing facts we may infer that the plaintiff might reasonably hesitate to use force to remove the machines.

Assuming that the foregoing facts are not sufficient to constitute a conversion, such facts, however, supplemented by a deliberate affirmance in reiteration of the claim of the defendant in its answer and its assertion of the right of possession, can be considered in determining whether the defendant did in fact deprive the plaintiff of his right of possession of his property. This, not upon the question of intention, but upon the fact of its actual deprivation of the plaintiff of his property right to continued possession of his chattels.

It would seem that any question as to whether there was a conversion of these bins is set at rest by the letter of Mr. F. S. Risley, a superintendent of the defendant, who on August 3, 1926, wrote to Mr. McGreevey in part as follows: " In accordance with the terms of our agreement we have taken over for our use the bins which are located on this property [referring to the property in Newark] and understand that you have removed the balance of the material such as forms, etc. We wish you would bear in mind, however, that we cannot permit the removal of any of the bins or structures now on the property without further application and negotiations with this company. Yours very truly." This written on a letterhead of the New York Central Railroad Company.

The only remaining questions are the amount of damages to which the plaintiff is entitled. It appeared upon the trial that the two machines, sand and stone batchers, had substantially the same equipment (S. M. p. 27) and cost the same amount (p. 33). I, therefore, assume that the two machines and equipment in 1926 were of substantially equal value. In the replevin action the question of damages has been complicated by the claim of the defendant under a "stipulation," so called, dated March 26, 1927, allowing Mr. McGreevey to remove the stone bin (replevin action) " without prejudice to any party by reason of this stipulation or of such removal." For the determination of the amount of damages, if any, to which the plaintiff is entitled by reason of the detention alleged in the complaint herein, the defendant's counsel claimed that the stipulation was not signed and was unauthorized by the plaintiff and was never accepted by him. The stipulation in question, which is the only paper in relation thereto which I find in the files submitted to me, was signed by Messrs. Williams and Cowie, attorneys for the defendants, and dated March 26, 1927. On that date these actions were pending. It seems to me that the claimed stipulation was permissive only. The plaintiff might have removed his bin, but lost no right by not doing so. The defendant could by appropriate

action have brought the matter before the court, at least brought the case on for trial. This occurred in 1927. The stipulation did not place upon the plaintiff the absolute duty to remove his equipment, and it did not relieve the defendant from all further obligations as a party to the action.

I am of the opinion that a plaintiff in an action of trover cannot recover the usable value and ask for depreciation covering the same period of time. (*Allen* v. *Fox*, 51 N. Y. 562, on top of p. 567.) Otherwise, the plaintiff in a replevin action might recover usable value of his chattel and an amount for depreciation equivalent to the original value of the chattel.

If the detention was illegal, the plaintiff is entitled to recover either the usable value of the machine replevined or for its depreciation. If the usable value in this case is taken as a standard, it would be difficult to determine with any accuracy the amount from March 26, 1927, to the present time. But we have some foundation for a finding if we attempt to determine its depreciation. The witness John E. Smith, sworn for the defendant, testified that on August 5, 1926, in his judgment the fair value of a single bin was $850, this upon the assumption that the cost in 1924 was $1,750. In view of the obsolescence of these bins in 1926, it seems to me that the value at fifty per cent cost price is reasonable.

It is apparent that in this valuation, as well as in the valuations by the other witnesses, it was assumed that the motor was a part of the equipment upon which a valuation was placed.

But it appears somewhat indirectly that Mr. McGreevey had removed the motors (S. M. p. 205, and also see p. 176), and it appears from the evidence of Mr. Callaghan (p. 187) that the motors were worth $425 each.

I have no means of determining the depreciation of the motors as compared with the other parts of the equipment and must assume that it is the same, so that without the motors in 1926 I find that the value of each machine was $638.50.

In the replevin action I find that the equipment replevined in 1926 was worth $638.50; that its present value is $100; depreciation $538.50. Judgment for the plaintiff for possession and $538.50, damages and costs.

In the trover action I find that the sand bin in 1926 was worth $638.50; judgment for the plaintiff for that amount and interest and costs.